**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NIKKO D'AMBROSIO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:24-cv-00678 |
| | ) | |
| ABBIGAIL RAJALA, | ) | |
| CAROL RAJALA, | ) | **JURY TRIAL DEMAND** |
| RODNEY RAJALA, | ) | |
| PAOLA SANCHEZ, | ) | |
| BLAKE MILLBRAND, | ) | |
| META PLATFORMS, INC., a Delaware Corporation, | ) | |
| SPILL THE TEA, INC., a Delaware Corporation, | ) | |
| JANE DOES 1-26, Unnamed Defendants using screen | ) | |
| names: Sam Daniels, Alexis Kyle, Coraline Lotz, | ) | |
| Dianne Wesley, Madison Pierce, Madison Bynum, | ) | |
| Vanessa Villatoro, Christy Graessle, Sharleen Waa, | ) | |
| Kaitlyn Mishay Moody, Linda Juarez, Amber Michelle, | ) | |
| Laura Maddox, Alina Drake, Chandi Constance, | ) | |
| Alicia Ann, Salisha P. Dean, Jillian Cara, Jen Rahbar, | ) | |
| Shannon Marie, Luisa Resendez, Daryl Ceasar, Lisa Miko, | ) | |
| Amy Dukstein-Reynolds, Melissa Pinkerton, Monica Tska, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT AT LAW

Now comes the Plaintiff, Nikko D'Ambrosio, by and through undersigned counsel, and

complaining of the Defendants, states as follows:

## NATURE OF THE ACTION

This is an action for declaratory and injunctive relief and for damages against Defendants

for the misappropriation of Plaintiff's intellectual property and likeness under the Illinois Right to

Publicity Act (765 ILCS 1075), in addition to the publication of false and defamatory statements

made and published by Defendants concerning Plaintiff under the Illinois Slander and Libel Act

(740 ILCS 145), to protect Plaintiff's rights to be free from the deliberate unauthorized

dissemination of Plaintiff's personal identifying information under the Illinois Civil Liability for

1

Doxing Act (740 ILCS 195), as well as a strict product liability and negligence claim, and common law causes of action. This action also challenges the defective design of Meta's recommendation algorithm, which actively amplifies defamatory content, thereby exacerbating the harm to Plaintiff. The design and operation of Meta's algorithms go beyond merely hosting third-party content, instead actively promoting defamatory statements to a wider audience, thus directly contributing to the severe reputational and emotional harm suffered by Plaintiff.

## **PARTIES**

1.      The Plaintiff, Nikko D'Ambrosio, is an adult male who is a citizen of Illinois and resided in the territorial jurisdiction of the District Court.

2.      The Defendant, Abbigail Rajala, is an adult female who is a citizen of and is domiciled in the State of Michigan. Defendant Abbigail Rajala engaged in the distribution of Plaintiff's intellectual property on or about November 13, 2023 by republishing a photograph which he owns containing his personal likeness on the internet.

3.      The Defendant, Carol Rajala, is an adult female who is a citizen of and is domiciled in the State of Michigan.

4.      The Defendant, Rodney Rajala, is an adult male who is a citizen of and is domiciled in the State of Michigan.

5.      The Defendant, Paola Sanchez, is an adult female who is a citizen of and is domiciled in the State of California. Paola Snachez in the owner and manager of Spill the Tea, Inc., and operates as the lead administrator of the "Are We Dating the Same Guy?" online communities. Sanchez's responsibilities include the manual review and approval of defamatory statements and republication of others' intellectual property without consent by members of her community.

2

Sanchez maintains a platform with the intent and purpose of enabling the unauthorized redistribution of others' intellectual property without consent. Sanchez has received substantial monetary proceeds in the form of crowdfunding and donations in order to support her illegal enterprise.

6.      The Defendant, Blake Millbrand, is a citizen of and domiciled in the State of California and is an owner of Spill The Tea, Inc. Millbrand is upon information and belief the primary software developer for the companies. Millbrand maintains a platform with the intent and purpose of enabling the unauthorized redistribution of others' intellectual property without consent. Upon information and belief, Millbrand has received substantial monetary proceeds in the form of crowdfunding and donations in order to support his illegal enterprise.

7.      The Defendant, Meta Platforms, Inc., is a corporation registered and authorized to do business in the State of Delaware and owns and operates the social media network known as Facebook.com. Meta Platforms has knowledge of and is aware of the "Are We Dating the Same Guy?" communities and the group's stated intent and rampant engagement in intellectual property violations, and has repeatedly refused to comply with demands from intellectual property holders to remove their intellectual property from the site.

8.      The Defendant, Spill The Tea, Inc. is a corporation registered and authorized to do business in the State of California and owns and operates the "Are We Dating the Same Guy?" communities. Spill The Tea, Inc. is an illegal enterprise with its stated intent and purpose to be enabling the unauthorized redistribution of others' intellectual property. Spill The Tea, Inc. maintains and operates the websites known as www.spilltheteainc.com, www.awdtsg.com, and www.arewedatingthesame.com. This Defendant receives compensation for enabling the unauthorized redistribution of intellectual property through subscription fees and crowdfunding.

3

9.     Plaintiff is unaware of the true names and capacities of several prospective Defendants sued herein as Jane Doe, and therefore Plaintiff sues these Defendants by the above-referenced fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and therefore alleges that each fictitiously named Defendant is responsible in some manner for the occurrences alleged and Plaintiff's injuries as herein alleged were proximately caused by said Defendants.

## JURISDICTION

10.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 in that all Plaintiffs and Defendants are domiciled within different States and the amount in controversy exceeds $75,000.00.

## VENUE

11.     Venue is proper under 28 U.S.C. § 1391(b)(2) in that all or a substantial part of the events or omissions giving rise to the claim occurred within this district.

## FACTS

### Are We Dating the Same Guy?

12.     "Are We Dating the Same Guy?" is a collection of social groups maintained on various social media platforms throughout the Internet by Defendants. Said platforms purport to provide an anonymous platform for women to, without authorization, republish intellectual property, discuss, and disparage men in their local communities with which they have allegedly had unsatisfactory dating experiences. The collection of online communities claims to have over 4,000,000 registered users. *See Exhibit A.*

4

13.     "Are We Dating the Same Guy?" self-describes its community as "Red Flag Awareness groups all across the country where women can empower each other and keep each other safe from toxic men." The group pontificates to the world that they are doing the "[L]ord's work" by maintaining a platform to enable and permit women to anonymously republish intellectual property of others without authorization, dox, defame, and attack the moral character of men they've met online. *See Exhibit A.*

14.     The "Are We Dating the Same Guy?" network of social platforms is divided into a large number of subgroups reflecting major metropolitan areas across the globe for the purposes of organization. Each and every platform carrying the "Are We Dating the Same Guy?" branding on any social media platform is operated by the same or substantially similar groups of individuals to the Defendants listed herein.

15.     Defendants Sanchez, Millbrand, Abbigal Rajala, Spill The Tea, Inc., and Jane Does have engaged in the creation, maintenance, publishing, and marketing, either as a user or administrative officer of a subgroup of "Are We Dating the Same Guy?" known as "Are We Dating the Same Guy? | Chicago" (The "Chicago Subgroup") maintained on the social network Facebook. Said group contains approximately 100,000 members.

16.     Defendants Sanchez, Millbrand, Spill The Tea, Meta Platforms, and Jane Does digitally monetize the "Are We Dating the Same Guy?" Platform through various avenues, including crowdfunding sources via Patreon, GoFundMe, and similar platforms, the collection of direct donations, and by displaying advertising and collecting consumer information related to users on the subject sites.

17.     That the Chicago Subgroup publishes dozens of instances of copyright infringement or otherwise stolen intellectual property alongside statements and narratives daily from women

5

who wish to provide personally identifiable information about a man in the community with which they allege to have had a dating relationship. Thousands of men have been potentially defamed, doxed, or had their intellectual property stolen by Defendants via these online publications and remain entirely unaware of the attacks on their character and misappropriation of their likenesses as a result of the social media group's private status and heavily moderated members list.

18.     No independent fact-checking of the statements made by any woman published in the community occurs. No verification that authorization exists for the republication of a man's intellectual property occurs. Women are permitted to make statements, publish photographs, defame, threaten, harass, belittle, or otherwise attack men whom they allege to have engaged in a dating relationship with, void of any oversight and with total impunity.

19.     Each and every Defendant has actual knowledge of intellectual property violations occurring on their platform and has actively refused to take any action to prevent continued infringement. Defendants not only permit intellectual property violations to occur, but actively encourage said violations. Further, Defendants encourage the publication of men's personally identifiable information and potentially defamatory statements, inclusive of full names, photographs, employer information, addresses, and similar.

20.     Defendants Sanchez and Spill The Tea frequently provide legal and editorial advice pertaining to the substance of posts in an effort to assist users in avoiding liability for their unlawful conduct. Group administrators will assist in the editing of language in particular posts in an effort to avoid civil or criminal liability for the dissemination of any particular statement or the republication of any particular piece of intellectual property, including providing extensive guidelines on how to circumvent Facebook's policies on preventing such conduct.

21.     Upon information and belief, certain agents and employees of Meta are active members, moderators, and administrators of the "Are We Dating the Same Guy?" communities and engage in the same or substantially similar conduct to that described in Paragraph 20 above. *See Exhibit G.*

22.     Several "Are We Dating the Same Guy?" Facebook groups, along with the accounts of several prominent administrators, including Defendant Sanchez, were previously banned by Meta for violations of Facebook's Community Guidelines in connection with the conduct described above.

23.     That subsequent to the removal of the aforementioned groups and accounts on the platform, Meta was contacted by Defendants Sanchez and Spill The Tea and reviewed the functions and purpose of the groups during the reinstatement process.

24.     Meta would have viewed the rampant intellectual property violations on the group pages, the group's rules encouraging users to violate others' intellectual property rights, and similar information during the reinstatement process.

25.     Any reasonable person, when reviewing the encouragement by Defendants Sanchez, Millbrand, Spill The Tea, and Jane Does to publish intellectual property without authorization, would have understood and become aware that unauthorized redistribution of intellectual property is apparent within the communities.

26.     Upon information and belief, Meta and its agents create, edit, modify, and develop particular pieces of content and software for the purpose of use by the Are We Dating the Same Guy communities, namely, without limitation, the enabling of "anonymous" posting and commenting within the groups and the enabling of software that permits group moderators and administrators to obtain information related to users who screenshot any particular post on the

group pages. This conduct assists in propagating and encouraging the republication of others' intellectual property without authorization, while Meta has actual knowledge of the rampant intellectual property violations apparent in the communities.

27. Meta has received thousands of individual notifications from men around the world that their intellectual property is being redistributed without authorization, and Meta has ignored these demands for takedown and, in the alternative, has sought to make legal determinations with respect to others' intellectual property rights in order to assist and enable the infringing conduct of the communities.

28. Meta continues to enrich itself by displaying advertising materials next to intellectual property which has been redistributed without authorization and collects consumer information and data from users which it chooses to display such content to.

29. Defendants Sanchez, Millbrand, Spill The Tea, and Jane Does have engaged in numerous crowdfunding events for the purpose of raising funds to develop a website, smartphone application, and other infrastructure to enable their illegal enterprise.

30. The purpose and intent of the "Are We Dating the Same Guy?" communities, its owners, administrators, moderators, and users, is to:

      a. Publish the personally identifying information of men through names, photographs, and locations;

      b. To publish private facts which are facially revealing and offensive pertaining to the personal lives of men, despite said facts being of no legitimate public concern for the purpose of commercial profit;

      c.     To republish the intellectual property of others without authorization for the purpose of commercial profit.

31.     On or about April, 2023, Defendants Sanchez, Millbrand, and Spill The Tea published a fundraiser on the "GoFundMe" platform seeking to raise funds in the amount of $50,000.00 for the development of a smartphone app to enable further unlawful conduct as described above. Said fundraiser has raised approximately $55,000.00 to date.

32.     Said fundraiser promises that all funds raised are "reinvested."

33.     Upon information and belief, Defendant Millbrand is a software developer by trade and has developed the relevant software for the smartphone application and websites maintained by Defendants Sanchez, Millbrand, and Spill the Tea.

34.     Upon information and belief, Defendants Millbrand and Sanchez are engaged in a dating relationship.

35.     Upon information and belief, no funds have been invested in the development of the smartphone application software, and Defendants Sanchez and Millbrand have retained said funds for their personal benefit.

36.     Upon information and belief, despite Defendant Sanchez, Millbrand, and Spill the Tea's statements to the contrary ("I really just used [the crowdfunding revenue to cover paying others…") dozens of moderators and administrators who were promised payment for their services remain unpaid, and Defendants Millbrand and Sanchez instead retained funds for their personal benefit.

37.     That on January 14, 2023, Defendant Sanchez published an announcement to her fundraiser page stating that a beta version of the application had been published. Sanchez wrote

that "The current beta version is testing screenshot blocking, screen record blocking, anonymous commenting, advanced tracking and logging to better help us catch bad actors."

38.     That the purpose of said features is to prevent victims from receiving notice that their intellectual property has been republished without authorization, that they are being defamed, harassed, doxed, and/or having private facts disclosed about them, in an effort to avoid liability.

39.     Upon information and belief, Defendants Sanchez and Millbrand use the revenue generated from their unlawful conduct to finance their personal lives at the expense of the victims and intellectual property holders.

40.     That on or about January 14, 2024, Defendant Sanchez published a fundraiser on the GoFundMe Platform seeking funds to finance their legal defense in the instant matter, which to date has raised nearly $40,000.00.

41.     That Defendant Sanchez maintains multiple accounts with "Venmo" an online payment processor and wallet service, known as @hownowpaopao and @awdtsgmoderators where she accepts funds for the express purpose of enriching themselves and allegedly distributing funds amongst the moderation team.

42.     Upon information and belief, Defendants Sanchez and Millbrand retain funds from the subject Venmo accounts for personal benefit.

43.     That on January 15, 2024, Defendant Sanchez published an announcement to the "Are We Dating the Same Guy?" community where she stated that users receive "hours and hours of benefits from this group…"

44.     Defendant Sanchez's choice of language is demonstrative of the true intent of the online community – to provide "hours and hours" of illegally reproduced intellectual property,

defamatory statements, personally identifiable information, and private facts regarding the victims' personal lives to its users at the expense of the victims and intellectual property holders.

**Abbigail Rajala**

45.     In 2023, Plaintiff and Defendant Abbigail Rajala met organically at a cultural event in Chicago, Illinois and briefly communicated with one another. Plaintiff and Defendant Abbigail Rajala engaged in consensual sexual intercourse on the evening they first met. The parties spent brief periods of time together on dates on a handful of occasions which were unremarkable. The parties never engaged in an exclusive dating relationship.

46.     That in November, 2023, Defendant Abbigail Rajala republished the intellectual property of the Plaintiff, a photograph of his likeness owned and controlled by Plaintiff, alongside provably false and defamatory statements pertaining to Plaintiff and disseminated same amongst members of the "Are We Dating the Same Guy? | Chicago" Facebook group, knowing said statements to be false and defamatory. Abbigail Rajala made these statements and republished the Plaintiff's intellectual property to over 100,000 anonymous women with the intent of causing him reputational harm and putting him in reasonable fear of bodily harm to himself or his family at the hands of any of the 100,000 unidentified women involved in the unlawful conduct apparent in the "Are We Dating the Same Guy?" communities. *See Exhibits B and C.*

47.     Commenters on Rajala's post requested personally identifiable information related to Plaintiff's employer in an effort to make contact with and defame the character and reputation of Plaintiff for the purpose of causing harm to his employment status and/or attempting to cause his loss of gainful employment.

48.     Upon information and belief, Defendants Rodney Rajala and Carol Rajala maintain a home internet network accessed and utilized by Defendant Abbigail Rajala for the purpose of

posting such statements, intellectual property, and personally identifiable information relating to Plaintiff. Upon information and belief, Defendants Rodney Rajala and Carol Rajala were complicit in the unauthorized redistribution of Plaintiff's intellectual property by permitting the unauthorized redistribution to occur on an internet network owned, maintained, and controlled by them.

### Jane Doe - Monica Tska

49.     Plaintiff has never met Defendant Jane Doe, sued herein under screen name Monica Tska, and the two have never interacted with one another.

50.     In November, 2023 in response to Abbigail Rajala's post containing the unauthorized republication of Plaintiff's intellectual property and his personally identifiable information, Monica Tska published a link to a CBS News Article detailing the arrest of one Anthony LaMonica, an Illinois resident who was charged with Criminal Sexual Assault. *See Exhibit C.*

51.     Defendant Tska used said article and the mugshot of LaMonica to claim that Plaintiff and Anthony LaMonica were the same person, and that Plaintiff had been accused of criminal sexual assault.

52.     Plaintiff is not Anthony LaMonica, has no relation to Anthony LaMonica, and has never committed, been charged with, nor convicted of criminal sexual assault.

53.     Monica Tska made false statements of fact about Plaintiff's criminal history with the intent of causing harm to his reputation and standing in the community, with actual knowledge of the falsity of the statements and/or with reckless disregard for the truth.

### Plaintiff's Attempts to Remove Unauthorized Redistribution of His Intellectual Property and Defamatory Statements

54.     Plaintiff has never created or maintained an account on Facebook or any other platform maintained by Meta, has never agreed to any of Meta's terms of service, community guidelines, or similar, and has never authorized any Defendant to take any action with respect to his intellectual property and/or likeness.

55.     That as part of the maintenance of the "Are We Dating the Same Guy?" Platform, Defendants Sanchez, Millbrand, Spill The Tea, Meta Platforms, and Jane Does engage in content moderation, which involves the review and approval of member applications, statements, and/or posts made on the platform.

56.     That as a part of Defendants' content moderation responsibilities, Defendants would have reviewed the false and defamatory statements made about Plaintiff in addition to the unauthorized redistribution of his intellectual property and approved same for publishing.

57.     On or about December 15, 2023 Defendants were contacted by Plaintiff and his attorneys demanding the removal of said intellectual property and false and defamatory statements.

58.     Immediately following Plaintiff's contact of Defendants, Defendant Abbigail Rajala removed her post on the platform containing the intellectual property of Plaintiff and false and defamatory statements pertaining to Plaintiff, and republished same under an "anonymous" handle on the "Are We Dating the Same Guy? | Chicago" Facebook group in an effort to avoid the detection of her identity while continuing to engage in her unlawful conduct. *See Exhibit C.*

59.     The Chicago subgroup, along with all other subgroups of the "Are We Dating the Same Guy?" community is maintained as an "invite-only" group on the Facebook platform intentionally and for the sole purpose of preventing victims of the Defendants' intellectual property violations and subjects of the Defendants' defamatory vitriol from becoming aware of the existence of same.

60.     As of July 19, 2024, Defendant Abbigail Rajala's "anonymous" post remains in the Chicago subgroup and continues to republish and retransmit Plaintiff's intellectual property to users without authorization, despite all Defendants having due Notice of said unlawful conduct by way of the instant matter.

61.     Upon information and belief, Meta Platforms utilizes sophisticated artificial intelligence software to generate algorithms which recommends content to users.

62.     Upon information and belief, Meta's targeted recommendation algorithms chose to display the intellectual property of Plaintiff alongside defamatory statements pertaining to Plaintiff to users by elevating Plaintiff's post to the top of users' content feeds.

63.     Upon information and belief, Meta took particular action to misappropriate Plaintiff's likeness and promote defamatory statements about Plaintiff by way of its recommendation algorithms.

64.     Defendant Meta Platforms willfully and intentionally displayed and continue to display advertising materials for the purpose of commercial profit on pages redistributing without authorization the intellectual property of Plaintiff, misappropriating Plaintiff's likeness, and/or transmitting false and defamatory statements or personally identifiable information pertaining to the Plaintiff.

65.     Defendant Meta Platforms willfully and intentionally continues to collect consumer information from users for the purpose of commercial profit on pages redistributing without authorization the intellectual property of Plaintiff, misappropriating Plaintiff's likeness, and/or transmitting false and defamatory statements or personally identifiable information pertaining to the Plaintiff.

66.     Plaintiff suffered emotional distress and anxiety caused by constant exposure to false information.

67.     The widespread reach and speed with which the defamatory content was disseminated through Defendant Meta Platforms' algorithms exacerbated this distress.

68.     Defendant Meta Platforms' algorithms played a crucial role in spreading defamatory statements to a larger audience, making the harm to Plaintiff much worse.

69.     This amplification turned what could have been a localized issue into a global one and increased the damage significantly.

70.     Defendant Meta Platforms' algorithm, which actively recommended content, resulted in first-party speech through curated recommendations.

71.     This goes beyond passive hosting by actively deciding what content to promote to users, making Defendant Meta Platforms' responsible for the harms caused by those recommendations.

72.     Defendant Meta Platforms' recommendation system was aware of the risks associated with the content it promoted yet failed to adjust its design to mitigate those risks.

73.     Defendant Meta Platforms' has knowledge of the risks posed by its algorithmic recommendations yet continues to use them without implementing sufficient safeguards.

74.     Defendant Meta Platforms' failure to address the defamatory content, despite being aware, allowed the harm to persist and exacerbate, leading to further financial and reputational losses.

75.     It is the responsibility of Defendant Meta Platforms' for designing an algorithm that prioritizes harmful or controversial content because it drives user engagement.

76.     Defendant Meta Platforms' was aware of the risks associated with its algorithms, including how they can promote or spread harmful, defamatory content.

77.     Despite this awareness, Defendant Meta Platforms' did not adjust its algorithms or implement safeguards to prevent harm to Plaintiff.

## COUNT ONE – MISAPPROPRIATION (765 ILCS 1075)
### Against All Defendants

78.     Plaintiff reincorporates and realleges each preceding paragraph as if specifically set forth herein.

79.     The Defendants, as part of an ongoing campaign of harassment and abuse, and for the Defendants' own financial gain, intentionally republished the Plaintiff's intellectual property, consisting of a photograph owned and controlled by him and containing his personal identity and likeness, without authorization.

80.     Defendant Meta Platforms' algorithms did not simply allow defamatory content to exist on its platform; they chose to display Plaintiff's likeness in conjunction with defamatory content, thereby misappropriating Plaintiff's identity for purposes of generating user engagement and advertising revenue.

81.     The Defendants published Plaintiff's identity for a commercial purpose, including the crowdsourcing of funds and collection of monetary proceeds from supporters of the "Are We Dating the Same Guy?" community. *See Exhibits A and D.*

82.     The Defendants did not seek to obtain permission from the Plaintiff before publishing and profiting from his identity and likeness.

83.     The Defendants have never had authorization from Plaintiff to publish his intellectual property or likeness for any purpose, whether commercial or otherwise. To the contrary, Defendants have been explicitly and repeatedly notified that they do not have authorization to republish Plaintiff's intellectual property but continue to do so for financial gain.

84. Defendant Meta continues to retransmit and republish Plaintiff's intellectual property and likeness without authorization for the purpose of commercial profit despite constructive and actual notice that they are engaging in unlawful conduct.

85. As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered and will continue to suffer significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss. These harms are ongoing and, if Defendants are not prevented from continuing to republish Plaintiff's intellectual property and likeness without authorization, those harms will continue.

## COUNT TWO – UNJUST ENRICHMENT
### Against All Defendants

86. Plaintiff reincorporates and realleges each preceding paragraph as if specifically set forth herein.

87. Defendants unjustly received benefits in the form of payments from supporters, crowdfunding proceeds, advertising revenue, and the collection of consumer data at Plaintiff's expense through their wrongful conduct. Defendants continue to unjustly retain these benefits at Plaintiff's expense. It would be unjust for Defendants to retain any value they obtained as a result of their wrongful conduct.

88. Plaintiff is entitled to full restitution of all amounts by which Defendants have been unjustly enriched at Plaintiff's expense.

## COUNT THREE - DEFAMATION *PER SE*
### Against Meta Platforms, Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill the Tea, Inc., Jane Does

89. Plaintiff reincorporates and realleges each preceding paragraph as if specifically set forth herein.

90.     Defendants are "information content providers" within the meaning of 47 U.S.C. 230 and continue to publish, intend to continue to publish, and cause to be published a series of repetitive false and defamatory statements of fact about Plaintiff in a manner that led and will continue to lead to the reasonably foreseeable publication and republication of those and similar statements.

91.     The defamatory meanings of Defendants' false statements and implied statements of fact are apparent from the face of the publication, refer to Plaintiff by name, are accompanied by Plaintiff's intellectual property consisting of an image of his likeness, and/or are understood to be written by Plaintiff.

92.     The statements authored, published, and caused to be published by Defendants about Plaintiff are reasonably understood to state or imply that Plaintiff is dishonest, immoral and/or untrustworthy.

93.     The statements authored, published, and caused to be published by Defendants about Plaintiff are reasonably understood to state or imply that Plaintiff has engaged in criminal activity by way of falsely accusing him of criminal sexual assault.

94.     Each of the statements and the implications stemming therefrom are false and defamatory *per se* in that said statements have damaged Plaintiff in his trade, office, or profession and in that they falsely accuse Plaintiff of engaging in criminal activity.

95.     Each of the statements published by Defendants are publicly available and was or will be viewed by thousands of individuals.

18

96.     Plaintiff is a private figure, but in any event each of these false statements were published with actual malice, *i.e.*, with knowledge of its falsity or with reckless disregard to the truth. At a minimum, Defendants acted negligently in assessing or investigating the truth of the statements prior to publication. Defendants had no applicable privilege or legal authorization to make these false and defamatory statements.

97.     Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and Defendants specifically intended to cause Plaintiff harm.

98.     Defendants' statements have damaged and continue to damage Plaintiff's reputation in the general public, in their professions, in their church communities, in their neighborhood, and with friends, relatives, and neighbors.

99.     Defendant Meta Platforms' is not shielded by Section 230 of the Communications Decency Act because it acted as more than a passive host of content. Defendant Meta Platforms' algorithmic choices directly facilitated the widespread dissemination of false and defamatory statements about Plaintiff, making it a key contributor to the harm suffered by Plaintiff.

100.    Defendant Meta Platforms' algorithms selected, promoted, and highlighted defamatory content about Plaintiff, creating a situation where the defamatory statements were seen by many more users than would have occurred through organic sharing alone, thus materially contributing to Plaintiff's damages.

101.    As a direct result of Defendant Meta Platforms' algorithmic promotion of false and defamatory content, Plaintiff suffered profound reputational harm, significant emotional distress, and emotional damages. The algorithm's decision to amplify the defamatory content exposed

Plaintiff to an audience far beyond the original scope, directly leading to a loss of professional opportunities and substantial emotional suffering.

102.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss. These harms are ongoing and, if Defendants are not prevented from continuing to repeat their defamatory statements about Plaintiff, those harms will continue.

## COUNT FOUR – CIVIL LIABILITY FOR DOXING (740 ILCS 195/15)
### Against Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, Inc., Jane Does

103.     Plaintiff restates and realleges each preceding paragraph as if specifically set forth herein.

104.     The Defendants, as part of a campaign of harassment and abuse, published the personally identifiable information of Plaintiff without his consent, namely his name and likeness to an online group dedicated to the harassment and belittlement of men with over 100,000 registered members.

105.     That the Defendants published said information with knowledge and/or reckless disregard to the fact that the publishing of defamatory statements accusing someone of horrific crimes such as criminal sexual assault alongside personally identifiable information to an online platform of over 100,000 individuals would cause Plaintiff to be reasonably likely or otherwise have reasonable fear that he is likely to suffer significant injury, including risk of death, bodily injury, or stalking.

106.    That as a direct and proximate cause of the Defendants actions, Plaintiff has suffered damages by way of significant emotional distress, disruption to his life, and fear of serious bodily injury at the hands of one of the group's thousands of unidentified members.

## COUNT FIVE – INVASION OF PRIVACY BY FALSE LIGHT; CIVIL CONSPIRACY
**Against Meta Platforms, Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, Inc., Jane Does**

107.    Plaintiff restates and realleges each preceding paragraph as if specifically set forth herein.

108.    The Defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about Plaintiff that represented such major misrepresentations of Plaintiff's character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in Plaintiff's position.

109.    The false light in which the Defendant's statements placed the Plaintiff's would be highly offensive to a reasonable person.

110.    The Defendants had knowledge that their statements were lies, or acted with reckless disregard as to their falsity of their statements and the false light in which the Plaintiff's would be placed.

111.    These false publications have caused Plaintiff actual and substantial damages.

112.    In light of their prior experience with similar sorts of reckless and false statements, the Defendants knew that their publications could cause the Plaintiff to suffer harassment and potential violence.

113.    The Plaintiff is a private individual and is neither a public official nor public figure.

114.    The defendants broadcast their outrageous, cruel, and malicious lies about the Plaintiff with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

115.    The Defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

116.    The Defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the Plaintiff and in furtherance of that scheme.

117.    As a result of the Defendants' wrongful conduct, Plaintiff has suffered damages.

## COUNT SIX – STRICT PRODUCTS LIABILITY
### Against Meta Platforms

118.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

119.    Defendant Meta Platforms' app and the algorithm that determines the content that each user sees is a product that is downloaded and used prospectively billions, of people across the world.

120.    Defendant Meta Platforms' app and its algorithm are designed, developed, programmed, manufactured, marketed, sold, supplied, distributed, operated, and/or managed by Defendant Meta Platforms.

121.    Plaintiff is seeking to hold the Defendant Meta Platforms responsible for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or distributors of their dangerously defective app and algorithm.

122.    The Defendant Meta Platforms, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts because:

     a.    Defendants are engaged in the business of designing, developing, programming, manufacturing, selling, marketing, supplying, and/or distributing app products and algorithms, like the Defendant Meta Platforms' app and its associated algorithm;

     b.    The Defendant Meta Platforms' app and algorithm which caused Plaintiff's harm was designed, created, programmed, developed, marketed, and placed in the general stream of commerce by Defendants;

     c.    The Defendant Meta Platforms' app and algorithm was expected to and did reach users without substantial change in the condition in which it was designed, developed, programmed, manufactured, marketed, distributed and/or sold;

     d.    The Defendant Meta Platforms' app and algorithm was designed, developed, programmed, manufactured, marketed, distributed and/or sold in the defective condition(s) for the reasons set forth herein.

123.    The Defendant Meta Platforms' app and its algorithm were in a defective condition as: (1) the danger contained therein is unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the subject product outweigh the burden or costs of taking precautions.

124.    The Defendant Meta Platform's, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, are strictly liable under § 402A of the Restatement (Second) of Torts, by:

     a.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) in a defective condition;

b.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) without adequate warnings;

c.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) without adequate parental control features;

d.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content;

e.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content, knowing that a failure to equip, program, or develop the app and algorithm with such safeguards that would result in the circulation of dangerous, harmful, and defamatory content;

f.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them into participating in the circulation of dangerous, harmful, and defamatory content;

g.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them despite knowing that this would lead to the proliferation of dangerous, harmful, and defamatory content;

h.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users;

i.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that preyed upon the vulnerability of users;

j.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to manipulate and/or encourage maximum engagement and/or participation by users;

k.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended inappropriate, dangerous, harmful, and defamatory content and facilitated participation in Facebook groups involving the same;

l.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its

24

algorithm) which lacked all the necessary safety features to protect users;

m.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) for which the risks of use far outweighed the utility thereof;

n.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was unreasonably dangerous for its intended and foreseeable uses and/or misuses and to its intended and foreseeable users;

o.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms app and its algorithm) that promoted the circulation of dangerous, harmful, and defamatory content;

p.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was incapable of preventing the circulation of dangerous, harmful, and defamatory content;

q.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content;

r.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content despite knowing that this would lead to reputational, emotional, and financial harm;

s.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not safe for its intended and represented purposes;

t.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that intentionally creates user addiction;

u.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that presents inappropriate, dangerous, harmful, and defamatory content;

v.  Despite having actual knowledge of dangerous, harmful, and defamatory content circulating through its app and platform and said content causing reputational, emotional, and financial harm, Defendant Meta Platforms' failed to assess the risks of the product and adopt available, reasonable, and feasible alternatives;

w.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that lacked all the necessary safety features to protect users;

x.  Designing, developing, programming, manufacturing, selling, supplying,

and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that malfunctioned by recommending dangerous, harmful, and defamatory content;

y.  Failing to warn users of the risks associated with the product (the Defendant Meta Platforms' app and its algorithm);

z.  Failing to warn users of the risks associated with dangerous, harmful, and defamatory content circulating through Defendant Meta Platforms' app and recommended to users;

aa.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) the risks and hazards of which far outweighed any utility or benefit of the product (i.e. in violation of the risk-utility test);

bb.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that lacked reasonable, available, and feasible alternative designs that would have made the product safer for users, and;

cc.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) the risks of which were unknown or unknowable to the consumer (i.e., in violation of the consumer expectations test).

125.  By conducting themselves as set forth above, the Defendant Meta Platforms' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's reputational, emotional, and financial harm.

126.  By reason of the breach of duties, pursuant to § 402A of the Restatement (Second) of Torts, by the Defendant Meta Platforms and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, Plaintiff was caused to sustain severe and permanent reputational, emotional, and financial harm as set forth above.

127.  The Defendant Meta Platforms' designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (the Defendant Meta Platforms' app and its algorithm)

the risks and hazards of which far outweighed its utility or benefit, thus violating the risk-utility test set forth in Restatement (Second) of Torts § 402A.

128.    The Defendant Meta Platforms' designed, developed, programmed, manufactured, sold, marketed, supplied, and/or distributed a product (the Defendant Meta Platforms' app and its algorithm) the risks of which were unknown or unknowable to the consumer and for which the consumer would not reasonably anticipate or appreciate the dangerous condition in violation of the consumer expectations test set forth in Restatement (Second) of Torts § 402A.

129.    The safety of the public and the users of the Defendant Meta Platforms' app, particularly children, must come first and be the paramount concern and consideration in the design, development, programming, supply, and distribution of Defendants' app and algorithm.

130.    Defendant Meta Platforms' knowingly exposed users to addiction, manipulation, and control causing them to promote, engage, and participate in dangerous, harmful, and defamatory content proliferation all in the name of greater corporate profits.

131.    The Defendant Meta Platforms' knew that dangerous, harmful, and defamatory content was circulating its app and being recommended to users by the Defendants' algorithm on users.

132.    The Defendant Meta Platforms' knew that users were promoting, engaging in, and participating in the proliferation of dangerous, harmful, and defamatory content based on recommendations by Defendants' algorithm.

133.    The Defendant Meta Platforms' Defendants outrageously prioritized revenues and profits over health and safety.

## COUNT SEVEN – NEGLIGENCE
### Against Meta Platforms

134.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

135.    The Defendant Meta Platforms had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm such that it did not expose users to harm.

136.    The Defendant Meta Platforms had a duty to monitor the dangerous and harmful content shared, posted, and/or circulated on their app and platform to ensure that it was not posted, shared, circulated, recommended, and/or encouraged.

137.    The Defendant Meta Platforms had a duty to monitor and evaluate the performance of their algorithm and ensure that it was not recommending or posting dangerous and harmful content.

138.    The Defendant Meta Platforms had a duty to employ and train personnel to appropriately and reasonably respond to notice that dangerous and harmful content were being posted, shared, and/or circulated on Defendants' app.

139.    The Defendant Meta Platforms had a duty to protect vulnerable users of their product.

140.    The Defendant Meta Platforms had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm such that it did not manipulate users and/or otherwise encourage them to engage in proliferating dangerous, harmful and defamatory content.

141.    The Defendant Meta Platforms had a duty to design, develop, program, manufacture, distribute, sell, supply, and/or operate their app and algorithm so that it did not create addiction and dependence among its users.

142.    The Defendant Meta Platforms miserably failed these aforementioned duties and as a result Plaintiff was harmed emotionally and financially and his reputation was severely harmed.

143.    Plaintiff seeks to hold the Defendant Meta Platforms liable for their own independent conduct as the designers, programmers, manufacturers, sellers, and/or distributors of their dangerously defective social media products and for their own independent acts of negligence, gross

negligence, carelessness, recklessness, and willful and wanton conduct as further described herein. Thus, Plaintiffs claims fall outside of any potential protections afforded by Section 230(c) of the Communications Decency Act.

144.    The injuries, damages and losses suffered by Plaintiff, as more fully set forth herein, were caused by the negligence, gross negligence, carelessness, recklessness, willful and wanton conduct of the Defendant Meta Platforms, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, both generally and in the following particular respects:

a.    Recommending and/or posting dangerous, harmful, and defamatory content;

b.    Allowing dangerous, harmful, and defamatory content, to be posted, shared, and/or circulated to users on the Defendant Meta Platforms' app;

c.    Creating an algorithm that recommended and/or posted dangerous, harmful, and defamatory content;

d.    Failing to prevent dangerous, harmful, and defamatory content from being posted, shared, and/or circulated to users on the Defendant Meta Platforms' app despite being actually aware of said content and despite knowing that such a failure would expose users to and facilitate the proliferation of dangerous, harmful, and defamatory content;

e.    Intentionally addicting users to the Defendant Meta Platforms' app;

f.    Intentionally addicting users to the Defendant Meta Platforms' app for the goal of increasing corporate revenues and profits;

g.    Manipulating and socially programming users into posting, engaging in, and participating in and proliferating dangerous, harmful, and defamatory content;

h.    Creating a digital environment in which the risks of proliferation of dangerous, harmful, and defamatory content are hidden and/or downplayed and in which users are encouraged to participate in the proliferation of;

i.    Failing to timely remove all dangerous, harmful, and defamatory content from its app;

j.    Hiring and/or employing personnel who were unfit, untrained, and/or incapable of operating and/or managing the Defendant Meta Platforms' app and its algorithm to ensure that dangerous, harmful, and defamatory content

were not posted, shared, or circulated to users on the app;

k.    Failing to adequately train, educate, and/or supervise its employees, contractors, agents, and/or servants such that they were capable of operating and/or managing the Defendant Meta Platforms' app and its algorithm to ensure that dangerous, harmful, and defamatory content were not posted, shared, or circulated to users on the app;

l.    Failing to remove dangerous, harmful, and defamatory content from the Defendant Meta Platforms' app despite knowing that users were being encouraged to engage in the proliferation of dangerous, harmful, and defamatory content and despite knowledge thereof;

m.    Manipulating and socially programming users to engage in certain desired activities and engagement on the Defendant Meta Platforms' app in order to maximize corporate revenues and profits;

n.    Developing, enacting, promulgating, and enforcing policies and procedures which allowed dangerous, harmful, and defamatory content to be posted, shared, and circulated on the app;

o.    Developing, enacting, promulgating, and enforcing policies and procedures which prevented the discovery of dangerous, harmful, and defamatory that were being posted, shared, and circulated to users on the app;

p.    Developing, enacting, promulgating, and enforcing policies and procedures which prevented the timely takedown of dangerous, harmful, and defamatory content;

q.    Developing, enacting, promulgating, and enforcing policies and procedures which resulted in the proliferation of dangerous, harmful, and defamatory content being recommended to users;

r.    Failing to prevent dangerous, harmful and defamatory content from being posted, shared, circulated, and/or recommended to users despite knowing that multiple people had been reputationally, economically, and financially harmed by the recommendations of the algorithm on the Defendant Meta Platforms' app;

s.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) in a defective condition;

t.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) without adequate warnings;

u.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content;

v.    Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its

algorithm) that was not equipped, programmed with, or developed with the necessary safeguards required to prevent circulation of dangerous, harmful, and defamatory content and deadly despite knowing that a failure to equip, program, or develop the app and algorithm with such safeguards would result in severe reputational, emotional, and financial harm;

w.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them into participating in the proliferation of dangerous, harmful, and defamatory content;

x.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users and manipulate them into participating in the proliferation of dangerous, harmful, and defamatory content despite knowing that this would lead to severe reputational, emotional, and financial harm;

y.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to addict users;

z.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that preyed upon the vulnerability of users;

aa.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was intended to manipulate and/or encourage maximum engagement and/or participation by users;

bb.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended inappropriate, dangerous, harmful, and defamatory content to users;

cc.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) which lacked all the necessary safety features;

dd.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) for which the risks of use far outweighed the utility thereof;

ee.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was unreasonably dangerous for its intended and foreseeable uses and/or misuses and to its intended and foreseeable users;

ff.  Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that promoted the circulation of dangerous, harmful, and

defamatory content;

gg. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was incapable of preventing the circulation of dangerous, harmful, and defamatory content;

hh. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content;

ii. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that recommended dangerous, harmful, and defamatory content despite knowing that this would lead to severe reputational, emotional, and financial harm;

jj. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that was not safe for its intended and represented purposes;

kk. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that intentionally creates user addiction;

ll. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that presents inappropriate, dangerous, harmful, and defamatory content;

mm. Despite having actual knowledge of dangerous, harmful, and defamatory content, circulating its app and platform and said videos and challenges causing serious reputational, emotional, and financial harm by failing to assess the risks of the product and adopt available, reasonable, and feasible alternatives;

nn. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that lacked all the necessary safety features;

oo. Designing, developing, programming, manufacturing, selling, supplying, and/or distributing a product (the Defendant Meta Platforms' app and its algorithm) that malfunctioned by recommending dangerous, harmful, and defamatory content;

pp. Failing to warn users of the risks associated with the product (the Defendant Meta Platforms' app and its algorithm);

qq. Failing to warn users of the risks associated with dangerous, harmful, and defamatory content circulating the Defendant Meta Platforms' app that was recommended to users;

145.    By conducting themselves as set forth above, the Defendant Meta Platforms' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm that caused Plaintiff's reputational, emotional, and financial harm.

146.    By reason of the Defendant Meta Platforms' carelessness, negligence, gross negligence, recklessness, and willful and wanton conduct, by and through their agents, servants, workers, contractors, designers, developers, programmers, manufacturers, sellers, marketers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, Plaintiff was caused to sustain severe reputational, emotional, and financial harm as set forth above.

147.    The safety of the public and the users of the Defendant Meta Platforms' app must come first and be the paramount concern and consideration in the design, development, programming, supply, and distribution of Defendants' app and algorithm as well as in the operation, oversight, supervision, and management of the app and algorithm and the content available, posted, shared, and/or recommended to users on the app.

148.    Outrageously, the Defendant Meta Platforms knowingly exposed the public to addiction, manipulation, and control causing them to promote, engage, and participate the proliferation of dangerous, harmful, and defamatory content all in the name of greater corporate profits.

149.    The Defendant Meta Platforms knew that dangerous, harmful, and defamatory content were circulating its app and being recommended to users by the Defendants' algorithm but failed to take appropriate, reasonable, timely, and necessary remedial actions.

150.    The Defendant Meta Platforms knew that reputational, emotional, financial harm were occurring due to the algorithm promoting users to participate in dangerous, harmful, and defamatory

content that Defendants' algorithm was recommending to them but failed to take appropriate, reasonable, timely, and necessary remedial actions.

151.    The Defendant Meta Platforms outrageously prioritized revenues and profits over the health and safety of its users.

## COUNT EIGHT – NEGLIGENT ENTRUSTMENT
### Against Meta Platforms

152.    Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs the same as though fully set forth herein.

153.    The injuries, harm, and damages incurred by Plaintiff were the direct result of the use of Defendant Meta Platforms' algorithmic recommendation system in a negligent and reckless manner, which Defendant knew, or had reason to know, involved an unreasonable risk of harm to users.

154.    Defendant Meta Platforms had control over the design, implementation, and deployment of its recommendation algorithm, and had the right and power to alter or limit the algorithm's functions, including the amplification and distribution of harmful content.

155.    Defendant Meta Platforms knew, or had reason to know, that its algorithm was likely to amplify harmful, dangerous, or defamatory content, because of the known design features that prioritize engagement and controversy, as well as prior incidents involving the algorithm's amplification of similar harmful content.

156.    Defendant Meta Platforms continued to entrust its algorithm to users by allowing it to operate in a manner that prioritized engagement without sufficient safeguards to prevent the amplification of dangerous content, despite knowledge of the risks associated with such use.

157.    Defendant Meta Platforms, as a direct and proximate result of their negligent entrustment of its algorithm, Plaintiff suffered injuries, damages, and harm, including but not

limited to reputational harm, emotional distress, and emotional losses, due to the

algorithm's amplification of defamatory and harmful content.

### COUNT NINE – DEFAMATION PER QUOD

**Against Meta Platforms, Inc., Abbigail Rajala, Paola Sanchez, Blake Millbrand, Spill The Tea, Inc., and Jane Does**

158.    Plaintiff restates and incorporates each preceding paragraph as if fully set forth herein.

159.    Defendants published or caused to be published statements about Plaintiff that are defamatory when considered in light of extrinsic facts known to the audience or that could be reasonably inferred.

160.    These statements, when understood in their proper context, implied false and defamatory meanings about Plaintiff, including accusations of criminal conduct, immoral behavior, or dishonesty.

161.    The defamatory nature of these statements are exceeding apparent when considering additional facts, such as Plaintiff's identity and background or prior relationships with other individuals named in the defamatory content.

162.    The statements have caused special damages to Plaintiff, including but not limited to emotional distress, emotional loss, loss of professional opportunities, and damage to his reputation and relationships.

163.    The statements were published negligently, recklessly, or with actual malice, in that Defendants either knew the defamatory implications of the statements or failed to take reasonable care to ascertain their truth before publication.

164.    Meta Platforms' recommendation algorithms materially contributed to the harm by amplifying the reach of the defamatory content, making it accessible to a larger audience and exacerbating the damage to Plaintiff's reputation.

165.    As a direct and proximate result of the publication of these statements, Plaintiff has suffered significant harm, including loss of income, business opportunities, and other pecuniary damages.

166.    Plaintiff seeks relief in the form of compensatory damages, punitive damages, and an injunction against further defamatory publications.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award Plaintiff:

a.  Injunctive relief enjoining Defendants from making or publishing, or causing to be made or published, any further statements repeating any and all false claims that Plaintiff engaged in any sort of immoral or illegal conduct of any kind;

b.  Injunctive relief requiring Defendant Meta Platforms to adjust its recommendation algorithms to prevent the amplification of defamatory content and to provide greater transparency regarding the mechanisms by which content is prioritized on its platforms;

c.  Compensatory damages, where appropriate;

d.  Punitive damages, where appropriate;

e.  Restitution, where appropriate;

f.  The costs of this action, including attorney's fees; and

g.  Any such other and further relief this Court deems equitable and just.

### **PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

*Marc Trent*
_____
Marc P. Trent (ARDC # 6324928)
Attorney for Plaintiff

**TRENT LAW FIRM, P.C.**
2 TransAm Plaza Drive, Suite 300
Oakbrook Terrace, IL 60181
(630) 682-3100
*service@trentlawfirm.com*



EXHIBIT

A

1 TO 6

# Create A Safe Platform For AWDTSG

$44,543 raised of $50,000 goal • 1.7K donations

Share

Donate now

 Anonymous
$20 • 8 d

 Anonymous
$20 • 9 d

 Ishita Gupta
$25 • 25 d

 Mackenzie Miles
$10 • 26 d

 Tiffany Ranney
$20 • 26 d

See all                                        See top

 Paola Sanchez is organizing this fundraiser.

I'm Paola Sanchez and I created and operate "AWDTSG" Red Flag Awareness groups all around the world where women can empower each other and keep each other safe from dangerous and/or toxic men.

I first started these groups to help solve some of the problems and dangers that me and my friends were experiencing with dating. We hit on a winning formula, and have grown by over 3.4 million members in just a year and a half, with over 600 moderators helping to run the groups. So we've stumbled onto something a lot of women are struggling with and are definitely onto something here... but this hasn't come without some struggles.

You may have noticed weird things going on with the groups these last few days. What happened was that 5 of our admin's accounts were abruptly deactivated all at once, including my 15 year old personal account. We've also had 4 of our groups suddenly shut down this week.. and none of those groups ever had community guideline violations.

With over 3,444,900 women in 212 groups we operate across the world, the sudden deactivation of all our admins has greatly disrupted our ability to keep them all safe. The worst part is the anxiety that comes with never knowing when or why our volunteers will suddenly be deactivated or a group will suddenly disappear.

These latest fiascos made me realize we need something better, and finally pushed me to start prioritizing my time towards building a new ideal platform for the lord's work we are doing here.. one with additional safety features such as screenshot logging, anonymous commenting, and much more.

I believe that the best way to keep women even safer is to create a platform where we can do everything we're doing in the groups, but with more specialized safety features and control over sharing.

But I realize that we need more resources to bring it into existence while continuing to operate and grow the current groups. I've started this GoFundMe to help raise as much of the development and operational costs as we can

I humbly ask you to please consider donating to support us in our efforts to help keep even more women safe

I guarantee that 100% of all money raised from this will go towards the design and development of an app or any necessary help in running the groups. I absolutely promise that 0% will go in my own pocket ♥

I sincerely appreciate all of the support you've continued to give us! You ladies seriously mean the world to me! With your help we have a real opportunity to help dating get better for women everywhere

- Paola ♥

P.S. To receive updates on development, please follow me on Instagram @hownowpaopao (https://www.instagram.com/hownowpaopao/) or enter your email on this simple web form I set up (https://www.awdtsg.com/), My instagram will be the main account to check for updates on the off chance more groups get deleted, so follow it for a place to regroup if you want to stay connected

P.P.S. If anyone has any friends or family at Facebook that they could put me in touch with to better understand things, please reach out to Dianne and let her know

P.P.P.S. We have looked into other existing platforms such as Discord and Reddit. It would be significantly more time consuming to determine that every member joining the group was for sure a real woman, and don't have the robust feature set we would want. It also still doesn't let us fine tune features to fit our specific safety concerns



P.P.P.P.S. I'm sorry that this isn't as detailed as I would have liked it to be, the deactivations all came so suddenly and I wasn't really planning on doing anything like this anytime soon.

P.P.P.P.P.S. Since first writing this, we have lost 6 groups totaling 251,800 members due to some overly restrictive FB moderation. I'm still fighting to try to get them back! But on a good note, within the last month alone their replacements have already reached 62,500 members but this further reinforces the fact that we need another platform.

EDIT! Here's some more information I was able to write out to address common questions:

I was hoping to announce this when it was further along and when I had written out something more informative that gave away more without giving too much, but this has pushed up the timeline in having to post it, as the group could potentially disappear at any moment without warning. I've been developing an app based off what I've learned in growing these groups. We've actually been able to find some great technical partners. It's not often that a concept gets validated and refined by a preexisting user base of millions of members, so that was very attractive in securing help.

If you're interested in giving a larger scale donation and having more details would be necessary for you to do so, please DM Dianne with the details around what you're thinking in terms of your investment, and in return I can happily provide you with more on the concept, as well as timetables, budgets, etc. It doesn't seem like a great idea to publicly release all of that information, as there's already competition in the market, and competing startups who may be able to use that information in their own plans. But I'm happy to share more in the right circumstances

I know this will take more than 50,000$. Any dollar previously given was reinvested. Even if I said it was for a coffee, I really just used it to cover paying others, design and development costs, legal expenses and filings, etc. I also invested my own savings into this, and had a small family and friends round.

I have had offers from institutional investors, and will leverage them if need be. But I wanted to attempt this GoFundMe campaign as a way to not have to rely on investment capital so early, and be able to keep more of the company in the hands of women ❤️

♡ Add a Reaction to this GoFundMe

## Updates (1)

**April 28th, 2023** by Paola Sanchez, Organizer

Hey everyone! Some of you may have noticed already, but early last week I got my account back  It only took a letter to the CA Attorney General, tickets submitted by Meta employees who were in some of our groups, and over 2 weeks of stress to get it back

That being said, I'm still going to start putting more of my time towards developing our own app just in case shutdowns continue to happen!

Our current plan is to build it where it could function in a similar way to these groups should they ever get taken down, but also serve as an extension for these groups for as long as Facebook allows these groups to stay up essentially meaning that if you crosspost and link between the two, it provides a way to comment anonymously, prevent screenshots, and allow us better tracking on which users view content that later leaks. At least that's the current plan

Donate Share



## Organizer


**Paola Sanchez**
Organizer
Brooklyn, NY

Contact

## Words of support (33)

Please donate to share words of support.


**Kathy Rose**
$100 • 7 mos

Thank you for all the meaningful work that you do to help keep women safe! 


**Shamaly Valdez**
$10 • 9 mos

Thank you for having the safe space to share and look out for one another


**Sara Ghattas**
$50 • 9 mos

Thank you for all that you do. It is a thankless job. As a woman who organizes events as part of her side hustle, I wish I had folks understand how important you are to our safety. Protect women!


**Erin Cheever**
$50 • 9 mos

The truth about the sickness in online dating culture must come out.


**Angela Teasenfitz**
$20 • 9 mos

You're doing God's work. Thank you!!!


**Stella Guan**
$20 • 10 mos

Thank you so much for your effort, Paola. Please reach out if you need any design help with the new platform.


**Nicole Eckert**
$20 • 10 mos

4

Although lost access when the big crash happened. You guys brought light to a situation and were a man wasted 5 years of my time. The women that commented shared and had also dealt with him were so supportive and we are all bonded. Doing the Lords... Read more



**MANDY VERNIER**
$25 • 10 mos

Women supporting women to protect women. Thank you for developing a safe space for all of us trying to navigate the dating world. I'm sure your efforts have saved alot of women from pain and heartbreak.



**Sarah Horrigan**
$25 • 10 mos

As a moderator... a separate platform would be life changing! Thank you for all you do Paola



**Kellie May**
$20 • 10 mos



Show more

Created March 15th, 2023 •  Community

⚐ Report fundraiser

## Your easy, powerful, and trusted home for help



**Easy**
Donate quickly and easily.



**Powerful**
Send help right to the people and causes you care about.



**Trusted**
Your donation is protected by the GoFundMe Giving Guarantee.

More ways to make a difference. Find fundraisers inspired by what you care about.



Nearby ⌄



6 of 6

EXHIBIT

B



EXHIBIT

C



1 TO 7

C

1 of 7



2



3

👍 Like    🗨 Comment    ▽ Send

All comments ▸

**Nicole Morisco**
I matched with him a month or so ago but convo never went anywhere

Like   Reply   5d

**Hannah Eve**
I went out with him a few times just over a year ago– he told me what I wanted to hear until I slept with him and then he ghosted... I'd steer clear.

Like   Reply   5d

**Marnie Knouse**
🔺🔺 He's been posted here before. The poster said he sent her a slew of texts calling her names because she didn't want to spend the night with him. I just searched and this was on November 2nd so take a look!

Like   Reply   5d

3



person.

Like   Reply   8w

**Anonymous member**
We met organically in Chicago two and a half months ago. Very clingy very fast. Flaunted money very awkwardly and kept talking about how I don't want to see his bad side, especially when he was on business calls. He came to see me yesterday, and I explained how I didn't really want to stay the night I just wanted to spend the day together. And this was his response.

Like   Reply   8w   Edited

**Anonymous member**
Anonymous member After I blocked his number, he texted me on another one. Which is the other text screenshot

Like   Reply   8w

**Monica Tska**
https://www.cbsnews.com/.../antho ny-lamonica-sexual.../

CBSNEWS.COM
Man Charged With Sexually ...

Like   Reply   7w

4





**Anonymous member**
December 27, 2023 at 11:48 AM · 🌐

Any 🔺 or 🔻?
Nikko, 32

👍 Like          ◯ Comment          ◁ Send

**Top comments**

**Nicole Morisco**
I matched with him a month or so ago but convo never went anywhere

Like  Reply  5d

**Marnie Knouse**
🔺🔺 He's been posted here before. The poster said he sent her a slew of texts calling her names because she didn't want to spend the night with him. I just searched and this was on November 2nd so take a look!

Like  Reply  5d





All comments

**Anonymous member**
We met organically in Chicago two
and a half months ago. Very clingy
very fast. Flaunted money very
awkwardly and kept talking about
how I don't want to see his bad
side, especially when he was on
business calls. He came to see me
yesterday, and I expl... See more

Like    Reply    8w    Edited

**Anonymous member**
Anonymous member After I
blocked his number, he
texted me on another one.
Which is the other text
screenshot

Like    Reply    8w

**Anonymous member**

1/2/24, 10:12 AM

Paola Sanchez | Creating safe & empowering communities for women to thrive in. | Patreon

Find a creator

Create on Patreon

Log in

Skip navigation

# Paola Sanchez

Creating safe & empowering communities for women to thrive in.

54 members · 158 posts · $146.8/month

Join for free

Home    About

EXHIBIT

1-2

1/2/24, 10:12 AM

Paola Sanchez | Creating safe & empowering communities for women to thrive in. | Patreon

Log in



## Sip of SafeTea
**$5** / month

Skip navigation

This tier level is perfect for those who want to show a little more support and want to stay updated on the development and growth of safe spaces for women.

- General Support



## Cup of SafeTea
**$10** / month

This is the tier level for those who want to show their support while also getting a behind the scenes look at the day to day operations of the current Red Flag Awareness groups as well as the development of our safetea dating app This tier includes: - beta app participation after one donation ever (once available) - interesting insights in running the groups as well as our development process - lists of worldwide group growth over time, mockups of apps and features, etc.

- Early access
- Behind-the-scenes content
- Work-in-progress updates (digital)



## Pot of SafeTea
**$25** / month

This is the tier level for those who strongly believe in the cause and might be interested in having a direct influence on the decision making process and have input in the development of our safetea dating app as well as the direction of the current groups ♥ p.s. omg I love you 😊 This tier includes: - beta app participation after one donation ever (once available) - interesting insights in running the groups as well as our development process - lists of worldwide group growth over time, mockups of apps and features, etc. - exclusive polls when making tough decisions on names, direction, etc. -a private community where we can further

1/8/24, 11:34 A

(4) Are We Dating The Same Guy? | Chicago | Facebook

tps://www.facebook.com/groups/315938570542151/search/?q=Nikko D%27Ambrosio

EXHIBIT

*E*

1-5

Ð

# Search Results

in *Are We Dating The Same Guy? | Chicago*

Nikko D'Ambrosio

## Filters

Posts You've Seen

Most Recent

Posted by

Tagged Location

Date Posted



**Anonymous member**
December 28, 2023 at 11:31 AM · 

Hii any tea on Nick? Seems sweet and thinking of meeting up. Just want to check for any red flags or anything before meeting in person since its my first time meeting someone from online. Thanks ladies 🥰

3 comments

Like          Comment          Send

**Anonymous member**
December 27, 2023 at 11:48 AM · 🌐

Any 🔻 or – ?
Nikko, 32

1 of 5



# Search Results

in Are We Dating The Same Guy? | Chicago

## Filters

Posts You've Seen

Most Recent

Date Posted



**Anonymous member**
December 3, 2023

Nick ▼▼▼ ▼▼▼ details/pics in comments once approved.

👍 7

| Like | Comment | Send |

3 comments

3 comments



2

/8/24, 11:34 AM

(4) Are We Dating The Same Guy? | Chicago | Facebook

tps://www.facebook.com/groups/3159385705421515/search/?q=Nikko D%27Ambrosio

3/5

## Search Results

in Are We Dating The Same Guy? | Chicago

**Filters**

Posts You've Seen

Most Recent

Date Posted

**Anonymous member**
November 6, 2023

Any – | or ▼ on Nick / Nicolas / Nicholas?

Like     Comment     Send

1 comment

2

Like     Comment     Send

**Anonymous member**
November 2, 2023

Any – | on Nikko 32?

3

(4) Are We Dating The Same Guy? | Chicago | Facebook



# Search Results

in Are We Dating The Same Guy? | Chicago

## Filters

Posts You've Seen

Most Recent

Date Posted



2:40

ps://www.facebook.com/groups/3159385705421511/search?q=Nikko D%27Ambrosio

(4) Are We Dating The Same Guy? | Chicago | Facebook

## Search Results

in Are We Dating The Same Guy? | Chicago

Filters

Posts You've Seen

Most Recent

Date Posted

Like

Comment

Send

3 comments



Are We Dating The Same Guy? | Chicago

**EXHIBIT**

F



**Paola Sanchez** ●
Moderator · October 2, 2022 · ●

···

We've been getting more reports of screenshots leaving the group and things getting back to some of the guys that were posted, so I'm dedicating a week of pinned posts to go over ==the harm== this can cause, how to protect yourself, and what to do if it happens.

I can not emphasize enough how important it is for you to not screenshot or share anything you see in here.

You may be friends with a guy and think that the words posted about him can't possibly be true, but I'm telling you right now to please trust me when I say that some men act differently with women in the dating scene and that can include violent encounters and behavior that they don't exhibit in front of friends and colleagues. Letting your friend know he was shared here compromises the safety of every girl that spoke up.

You may have just found your boyfriend on here and feel the need to confront him about it. Don't let your emotions cloud your judgement. Take the time to think of another place where you heard the information and don't ever let him know that he was posted in any sort of group. That slip up could lead him back here to harass girls in an effort to destroy the evidence.

You may think you're just innocently sharing something funny, but then that person sends it to someone who knows someone and soon after the guy is coming after the girl who thought she could post safely here. Just put yourself in her shoes for one second and think about how scared she must feel.

We have a rigorous vetting process and have been working extremely hard to keep out any fake profiles and Trojan horses. And honestly I think we've gotten it down really good! Just to give you one example of the things we're dealing with: One man who was posted about in the group created two fake profiles (having stolen his profile pics from a girl on Instagram) in an attempt to get in. We caught and blocked both of them, at which point he messaged every moderator of the page threatening legal action in an attempt to get the post taken down.

We're working our absolute hardest to keep this group as safe as humanly possible, but it's all for nothing if girls are leaking info out of the group anyways.

So please, strongly consider ==the harm== you might cause and don't screenshot or share anything outside of the group. We want to keep this as safe of a space as we possibly can.

And, as always, thank you from the bottom of my heart to the vast majority of you who are doing nothing wrong except existing in here and supporting each other 😊 🙏 😊



27 comments



From:
To:
Date: 



**6:35** 🎤 .ıl LTE 41

‹ ⋯

1/14/24, 12:53 AM

**Paola Sanchez** ✓
Admin · April 6 · 🌐                                    ⋯

Hey everyone! Some of you may have noticed already, but early last week I got my account back 🥹❤️ It only took a letter to the CA Attorney General, tickets submitted by Meta employees who were in some of our groups, and over 2 weeks of stress to get it back 😶🫠

That being said, I'm still going to start putting more of my time towards developing our own app just in case shutdowns continue to happen! If you'd like to sign up to receive progress updates on the app, I set up a simple sign up page at https://www.awdtsg.com ❤️ the signup has optional fields for your name and city. If this page ever goes down, we'll use that email list to help regroup members 🙂 if you want updates but don't check your email, I'll also be posting updates on my Instagram @hownowpaopao 💕

Our current plan is to build it where it could function in a similar way to these groups should they ever get taken down, but also serve as an extension for these groups for as long as Facebook allows these groups to stay up 🙂 essentially meaning that if you crosspost and link between the two, it provides a way to comment anonymously, prevent screenshots, and allow us better tracking on which users view content that later leaks. At least that's the current plan 😊

The other thing I wanted to mention today is that, with it having been months since we last did the pinned posts here, starting on Monday we're going to repost all of them over the next month or two! In the spirit of me focusing more of my time on the app, some of the moderators who stepped up to keep things running while I was deactivated will be the ones running the series in most cities 😊

We wrote out a bunch of informational posts that will hopefully answer some of the most common questions and criticisms 🙂 Some of the topics we'll be covering include:

Anonymous Posting Issues

Screenshots - Don't Do It
Screenshots - Risk
Screenshots - Be Prepared
Screenshots - Confrontation
Screenshots - What To Do



Sent from my iPhone