# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>NIKKO D'AMBROSIO,<br><br>    Defendant. | 23 CR 323-01<br>Judge Thomas M. Durkin |

### DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT; AND POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS

Defendant, **Nikko D'Ambrosio**, by and through his attorneys, **Christopher Grohman** and **Ryan Levitt**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits Defendant's Clarifications and Objections to the Presentence Investigation Report; and Position Paper and Commentary on Sentencing Factors. For the reasons that follow, Mr. D'Ambrosio, through counsel, respectfully requests that this Court impose a sentence below the probation officer's recommendation of one-year-and-one-day in custody, which sentence would be sufficient yet not greater than necessary to effectuate the goals of 18 U.S.C. § 3553(a).

I.  Clarifications and Objections to the Presentence Investigation Report

   A.  Offense Level Computation, p. 8 ¶ 29: I Comment to the Application of U.S.S.G. § 3C1.1

In calculating the advisory guidelines range, the Presentence Investigation Report ("PSR") applied a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. PSR p. 8 ¶ 29. It found this enhancement applied because Mr. D'Ambrosio "testified falsely at trial," namely, "[h]e claimed he did not have a role in preparing the false returns and did not review his filed returns." *Id.*

In its version of the offense, the government argued that Mr. D'Ambrosio's alleged false testimony included the following:

> Defendant testified that Dacanay provided all of the false information in the worksheets that supported the false tax returns and that defendant neither reviewed the worksheets that he provided to January-Fort nor the draft tax returns that January-Fort sent to defendant. Defendant testified that he signed Forms 8879, which contained an attestation under penalty of perjury that he had reviewed the tax return and that it was accurate, without actually having read and reviewed the draft tax return.

The government's position still appears to be that, Nicholas Dacanay, D'Ambrosio's cousin who prepared D'Ambrosio's tax returns, despite being an MBA/CPA, and having worked at the IRS for many years, was morally unsullied, clean as clean can be, and in the end, not involved in any fraud. Dacanay, despite being highly educated in this field, did not seem to notice that the mileage deductions equaled twice the distance to the moon and back or that the business meals expenses would have been the equivalent of nightly reservations for one of Alinea's first-floor gallery tables. Dacanay, despite emailing Ms. January-Fort that D'Ambrosio did a "nice job on his work papers," claims to have not actually looked at the workpapers. Indeed, he is still employed at the IRS.

2

A more plausible explanation would be that one cousin reached out to the other cousin, and the cousin that both works for the IRS and has prepared the other cousin's tax returns for years, told the tax-filing cousin that he can claim whatever bogus deductions he wants and the chances of him getting caught are negligibly low.

Perhaps where the truth lies on this point is neither here nor there. As discussed below, following the trial, Nikko has come to terms with his responsibility for filing complete and truthful tax returns, and has taken steps toward ameliorating the effects of his behavior.

That said, it is against this backdrop that the Court should consider the context for his testimony–as the trial evidence showed, there was zero written communication from D'Ambrosio to Dacanay containing false information; indeed, the false information flowed only in the other direction, from Dacanay to D'Ambrosio.

The Court should also remain cognizant of the ever-growing scrutiny this enhancement faces when applied to a defendant's allegedly false testimony. For example, Judge Jed S. Rakoff has long been publicly critical of "trial taxes."[1] In the course of one such interview, he explained how he *never* applies the obstruction enhancement after a trial, even when he thinks the defendant lied about a material matter. Judge Rakoff explained that he thinks "frankly, it is unconstitutional," it "chills" the rights of the defendant to testify in their own defense out of fear of the decision of a single person—the judge alone—and the possibility of facing an increased punishment entirely upon those independent grounds. For that reason, he used to make a specific practice of telling defendants at arraignment that there will be no penalty if they ultimately proceed to trial and testify in their own defense.

---

[1] *See* For the Defense Podcast, Episode Nine Judge Jed Rakoff, April 13, 2021, *available at* https://tinyurl.com/5n8jnz8u (last accessed April 25, 2024).

3

**B. Objection to Certain Proposed Conditions of Supervised Release.**

Conditions of supervised release carry the force of law and allow the Court to imprison a defendant who violates any one of them. *See* 18 U.S.C. §§ 3583(e)(3), 3565(a). They must therefore be "(a) appropriately tailored to the defendant's offense, personal history and characteristics; (b) involve no greater deprivation of liberty than is reasonably necessary to achieve the goals of deterrence, protection of the public, and rehabilitation; and (c) sufficiently specific to place the defendant on notice of what is expected." *United States v. Kappes*, 782 F.3d 828, 847 (7th Cir. 2015); 18 U.S.C. § 3583(d)(1)-(3). Moreover, sentencing courts are required to define supervised release conditions in a manner that provides defendants with clear notice of what the condition requires, as well as an adequate rationale for imposing the condition. *See United States v. Adkins,* 743 F.3d 176, 194 (7th Cir. 2014); *see also United States v. Poulin,* 745 F.3d 796, 800 (7th Cir. 2014). The Court has a number of options before it in fashioning a potential sentence for Mr. D'Ambrosio. It certainly can and should consider imposing many of the appropriate terms recommended by the probation officer, both for Mr. D'Ambrosio's benefit and society–after of course balancing the mitigating information presented herein and all other required considerations. With these principles in mind, Mr. D'Ambrosio, through counsel, poses the following requested modifications to the PSR's recommended conditions of supervised release:

**i. Discretionary Condition # 6.** The restriction that Mr. D'Ambrosio not "knowingly meet or communicate with any person whom [he] know[s] to be engaged, or planning to be engaged, in criminal activity," at a minimum, needs to be clarified following general Seventh Circuit guidance to strike the superfluous language which, in this instance, follows the quoted portion. It overlaps to

4

a degree with the mandatory condition that Mr. D'Ambrosio himself does not violate any law, it does not "fit" with the facts of the case and does not further any apparent rehabilitative goal.

**ii. Discretionary Condition # 7.** Mr. D'Ambrosio has always had a healthy relationship with alcohol, rarely consuming it and never so much as trying illicit substances. He is so healthy that he has a six-pack in his thirties. *Cf.* PSR p. 27 ¶ 117 ("[h]e is a relatively physically and mentally healthy young man, with no problems with drugs or alcohol). If this discretionary condition is meant to in fact be "discretionary" and not applied in some cases, this appears to be one of them.

Aside from the foregoing, Mr. D'Ambrosio and counsel have no objections to the proposed terms of supervised release and waive their formal reading.

**II.     Position Paper and Commentary on Sentencing Factors.**

**A. Introduction**

Mr. D'Ambrosio will appear before the Court humble and contrite, and hopefully on time. It is true that he, based on advice from others, rolled the proverbial dice, held the government to its burden of proof, and now finds himself in no better position for it. This does not make him any less sincere in his remorse. The assertion of his rights does not denigrate the profound regret and shame he feels for his conduct. It does not change the fact that he has lived under storm clouds since the investigation began and the indictment issued. Nor does it minimize the profound anxiety, stress, and depression he suffered as a result. Aside from the instant offense, Mr. D'Ambrosio is someone who has tried to work hard, be kind (arguably except to the occasional dating prospect) and give back to his family and community throughout his entire life. Along the way—and most tragically—he was found guilty of cheating on his taxes. In doing so, he made the most regrettable decisions of his life and comes before the Court, as noted, fully contrite and, indeed, remorseful.

5

The fact that the case has taken some time to proceed to sentencing as most do has given Mr. D'Ambrosio a lot of time to think about his decisions, about the harm he has caused, about redemption, forgiveness, and doing whatever is necessary to make amends to the best of his ability. All the while, and despite this case constituting his first substantial involvement with the criminal justice system, Mr. D'Ambrosio still retains many positive characteristics and attributes. He continues to maintain a support network and community connections, and the other forms of support he will need to come through this as a stronger and better person.

Fortunately, in our post-*Booker* world, there are many more considerations to weigh at any given defendant's sentencing hearing than just the applicable guidelines range. *See, e.g., Gall v. United States*, 552 U.S. 38, 49-50 (2007). Since *Booker*, that range has remained only advice that this Court is to consider but not required to follow. The guidelines, however, may be flawed even in that capacity, as the Supreme Court held in *Nelson v. United States*, 555 U.S. 350, 351 (2009), when it stated that "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." Ultimately then, today, the guidelines present at most a "starting point" and "initial benchmark" for this Court to consider in determining a just and appropriate sentence. *See Gall*, 552 U.S. at 49-51. Likewise, per *Gall*, the Supreme Court directed the sentencing judge to "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

As just noted, the parties agree that Mr. D'Ambrosio's criminal history score is zero, establishing a criminal history category of one. Mr. D'Ambrosio, through counsel, requests that this Court impose a below-guidelines sentence sufficient yet not greater than necessary to effectuate the goals of 18 U.S.C. § 3553(a).

**B. The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))**

Tax offenses, like practically all offenses prosecuted in the Dirksen Federal Courthouse, are indisputably serious offenses. Taxes pay for important services that all of society benefits from–schools, roads, social security, whatever wars we are bankrolling at the time, and so on. Indeed, counsel was recently given a special assessment to pave the alley and found the experience irksome. Nonetheless, the tax man cometh. If the body politic finds it is acceptable to not pay their fair share of taxes, a classic slippery slope emerges, and the pot of money that keeps society functioning would become depleted.

Yet it remains important to keep perspective: Mr. D'Ambrosio is a first-time offender being sentenced to a non-violent offense. *See* 18 U.S.C. § 994(j). His offense did not result in harm to any discrete, identifiable individuals, and nor did he use the funds to finance an extravagant, over-the-top lifestyle. Indeed, the PSR shows that D'Ambrosio just kept the money in non-interest-bearing accounts. He did not even invest it! And he did all this while helping pay for his mother and grandmother's daily living expenses. *See, e.g.,* PSR p. 19 ¶ 95.

It should also be noted that D'Ambrosio went to trial because he is an individual that relies heavily on the advice of others–lawyers (including those who would counsel filing lawsuits against previous tinder dates), tax professionals, and the like–and is very insecure in making his own decisions, likely recognizing the cognitive difficulties he has as a result of having anoxia at birth.

Since trial, Mr. D'Ambrosio has sought better advice and has begun to take steps to remedy his tax deficiencies. He has hired a real accountant and has filed accurate returns for 2021, 2022, and 2023, and paid all three of those years tax bills in full (not counting any late fees and interest that may be assessed down the road). On the advice of counsel, he was prepared to amend tax years

7

2019 and 2020 to correct the meals deduction, but given that the restitution amount in the PSR reflects what the payments should be for those years had the returns been accurate, he chose to pre-pay the $166,000 in restitution to the clerk of the court, a receipt for which is attached hereto as an exhibit. *See, e.g.*, *United States v. Oligmueller*, 198 F.3d 669, 671 (8th Cir. 1999) (recognizing a district court's authority to depart downward when there are extraordinary efforts at restitution); *United States v. Condelee*, 961 F.2d 1251, 1353 (8th Cir. 1991) (recognizing a sentencing court's authority to department downward "in unusual circumstances such as extraordinary restitution"); *United States v. Garlich*, 951 F.2d 161, 163 (8th Cir. 1991) (remanding for resentencing because the district court should have considered "whether the extent and timing of [defendant's] restitution was sufficiently unusual to warrant a downward departure").

**C. The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))**

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Perhaps more than any other § 3553(a) factor, Mr. D'Ambrosio's humble life story, devotion to his family, and service to his community through countless selfless acts weighs heavily in favor of imposing a sentence below the probation officer' recommendation of one-year-and-one-day in custody.

Nikko D'Ambrosio was born on April 12, 1991, in Maywood, Illinois, to his parents, Rocco Sr. and Ana. PSR p. 10 ¶ 50. He is the middle child of three, with an older sister, Katrina, who is a consultant living in the suburbs, and his younger brother, Rocco Jr., who is employed in sales and lives in Phoenix. PSR p. 11 ¶ 51. Mr. D'Ambrosio and his siblings had a tight-knit family growing up, and while the family lived modestly, they were always provided for. *Id.* at ¶ 52.

8

Life was still not without its turbulence, as Mr. D'Ambrosio's father has a criminal record and spent approximately three years in custody during Mr. D'Ambrosio's youth. *Id.* The two were very close despite that absence and its attending circumstances. More recently, Mr. D'Ambrosio's father was on disability, and in 2020, he tragically passed away in a motor vehicle accident while high on methamphetamines. *Id.* As an officer testified at trial, Nikko arrived at the scene of the crash and was very distraught.

This tragedy had a profound impact on Mr. D'Ambrosio. It is not entirely a coincidence that the offense primarily occurred in the period following this loss. As noted in the PSR, Mr. D'Ambrosio was required to step up in the family following his father's death. He assumed greater care and responsibility for his mother and paternal grandmother, which included taking on additional financial responsibilities. PSR p. 11 ¶ 55.

Mr. D'Ambrosio is also an individual who has struggled with intellectual challenges throughout his life. This became relevant at trial, and the Court has already heard a good deal of testimony regarding his educational background. As noted in the PSR, Mr. D'Ambrosio did have interventions for possible learning disability in his youth, although he was not diagnosed with one. There is documentation of the fact that he suffered a lack of oxygen during his birth and was later diagnosed with frontal lobe epilepsy. PSR p. 13 ¶ 66. Mr. D'Ambrosio's mother confirmed for the probation officer that he was born prematurely, suffered from developmental delays, and experienced night terrors and "absent seizures." *Id.* As noted in Dr. Farmilant's psychological evaluation presented at trial, Mr. D'Ambrosio meets the diagnostic criteria for mild neurocognitive disorder and other specified neurodevelopmental disorders associated with anoxia at birth. *Id.* at ¶ 69.

9

As a result of his neuro-developmental issues, school was always more difficult for Mr. D'Ambrosio. *Id.* at ¶ 81. He managed to graduate high school and attend some college courses, but he quickly moved into the vocational world upon reaching adulthood. As documented in the PSR, at various times he has worked at the airport, at an electric company, as private security, and more recently in sales as an independent contractor. *Id.* at ¶ 84-88. While Mr. D'Ambrosio is young and in good physical health, in October 2023 he was injured in a car accident and is still in the process of rehabbing two bulging discs in his back. *Id.* at ¶ 64.

As to his personal character, like most individuals who appear before this Court, there is so much more to Nikko than simply the allegations against him. That side of him—the loving family member, charitable community member, and all-around kind-hearted individual—is best described in the character reference letters counsel has asked him to obtain from his friend and family members.

Illustrative is the letter from Katrina Trikolas, Nikko's sister.[2] She explained that Nikko "has always displayed qualities of kindness, integrity, and responsibility." Katrina recognized that Nikko "stepped up" when the two lost their Dad and great grandmother within three months of each other. She also recognized the stress the case has brought the entire family, but Nikko has persevered with grace, doing what he can "to keep everyone together and happy, putting everyone before him." Ultimately, Nikko today remains a "wonderful person" who has the "biggest heart" and is always there for others.

Sam Amirante, a practicing attorney since 1974 and retired judge as of 2005, has known Nikko on a personal level throughout his life, as the two are cousins. Judge Amirante described

---

[2] All letters of support are attached hereto as Exhibit A.

10

Nikko as "an invaluable pillar of support for our family" who "has consistently demonstrated a selfless dedication to his family's well-being." He, too, observed how Nikko supported the family in his father's passing, whether it be emotional, financial, or in any necessary capacity. Because of that personal character, his potential for rehabilitation, and willingness to make amends, Judge Amirante shared in the request for leniency.

Patrick Kelleher, a practicing corporate attorney, wrote the Court on Nikko's behalf as well. Patrick's mother was suffering extreme physical health issues, and his dad had passed several months prior. He met Nikko through their local gym, and the two quickly became friends, with Nikko providing "constant support and encouragement to me which made that difficult time a bit easier." Over time, Patrick became a family friend and witnessed his devotion and commitment to his family first-hand. He has seen Nikko extend the same kindness to friends and strangers, including by volunteering to help out at their local church.

Marc P. Trent, yet another lawyer and friend of Mr. D'Ambrosio, wrote the Court on his behalf as well. Mr. Trent represents Mr. D'Ambrosio on the civil suit related to his past Tinder matches, and he echoed many of the same qualities. Specifically, he has observed first-hand the tremendous support Nikko provides his family, and also the personal toll this case has already taken on him.

As one last example, Rafael Capó, Vice President for Mission and Ministry at St. Thomas University, wrote to express his belief that "a lenient sentence for Nikko [. . .] would allow him to continue contributing positively to our community." Father Capó has known Nikko for seven years in his capacity as a priest and member of the Catholic Church. He noted that Nikko "is an active and dedicated member of his local Church in the Archdiocese of Chicago, demonstrating a strong

11

commitment to his faith as a practicing Catholic." Moreover, Father Capó personally attested to the fact that Nikko supports various charitable works, "as he has always been ready to support with his time, talent, and treasure the different ministries I have directed."

The foregoing is only a sampling of Mr. D'Ambrosio's personal characteristics from his friends, family, colleagues—those who know him best. Those letters will be provided to the Court and the government in advance of the sentencing hearing.

### D. The Requested Sentence Will be Sufficient to Comply with the Factors Set Forth in 18 U.S.C. § 3553(a)(2)

> "Our new Constitution is now established, everything seems to promise it will be durable; but, in this world, nothing is certain except death and taxes."
>
> — Benjamin Franklin

After considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court is charged with fashioning a sentence that is sufficient, but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from further crimes of the defendant, and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

Specific deterrence is not an issue in this case. Mr. D'Ambrosio knows that the IRS will scrutinize his every filing going forward (as it should), and if he steps out of line, they will be ready to pounce. Further, he has hired a reputable accountant to put together the 2021-23 and future filings.

12

Although counsel respectfully believes that the general public is never deterred by a specific sentence in any particular case, tax cases may be the exception to that rule, although there is no empirical evidence to suggest that the certainty of prison versus the certainty of punishment makes a difference.[3]

There is a common wisdom in these types of cases that without imposition of a custodial term, citizens are free to attempt to cheat on their taxes without significant enough deterrence should they get caught other than to have to pay back the amount due and owing. But this position does not account for the fact that Congress expressly authorized non-custodial sentences as sufficient and appropriate sentences in tax cases. That choice logically implies non-custodial sentences are intended as an appropriate sentence for at least some number of tax defendants, and one cannot start from the position of adopting a *per se* rule that all of them—or even all of the ones that exercise their right to trial—are not appropriate candidates for such a sentence.

This logic also discounts the very real and deleterious consequences that Mr. D'Ambrosio will endure because of his conviction. Namely, Mr. D'Ambrosio, like most, has been living under proverbially storm clouds since the indictment was returned, if not beforehand. He has had to endure the stress, anxiety, and uncertainty that comes with living life under federal investigation and then indictment. Mr. D'Ambrosio is now and forever a convicted felon. He will have to successfully

---

[3] In spite of its central importance, and the very high expectation we have that legal punishment and criminal justice policies can inhibit crime, we do not have very solid and credible empirical evidence that deterrence through the imposition of criminal sanctions works very well." Professor Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence*; Northwestern Law School Journal of Criminal Law and Criminology, Summer 2010. In fact, at least when it comes to the ultimate punishment, the opposite is true. *See, e.g.,* Amnesty International, A Clear Scientific Consensus that the Death Penalty does NOT Deter, *available at* https://tinyurl.com/5f3f6zb8 (last accessed May 2, 2024); Death Penalty Information Center, Murder Rate of Death Penalty States Compared to Non-Death Penalty States, *available at* https://tinyurl.com/mu67af9z; (last accessed May 2, 2024).

complete a period of probation or supervised release, in addition to any other financial penalties above and beyond repayment of the amount due and owing, and the myriad collateral consequences his conviction will carry. Moreover, this offense involved a minimal tax loss—one that often appears too insignificant to justify a federal investigation and prosecution.

It is worth acknowledgement that, while there is no certainty in the process, for a first-time offender with a minimal tax loss amount who is otherwise gainfully employed and/or positively contributing to society, in the event of a guilty plea, a non-custodial sentence is perhaps fairly described as a common outcome. Defendants who plead guilty enjoy the benefits of acceptance of responsibility, both in terms of reduction to the guidelines range itself, and the support it provides to § 3553(a) arguments regarding a defendant's post-offense rehabilitation.

But a "trial tax" or "trial penalty" can arise where "the discrepancy between the sentence the prosecutor is willing to offer in exchange for a guilty plea and the sentence that would be imposed after a trial."[4] The gap between a defendant's sentence post-trial and post-plea sentencing can be so great "it becomes an overwhelming influence in a defendant's consideration of a plea deal." *Id.* Defendants convicted at trial routinely receive harsher punishments compared to defendants who plead guilty. Brian D. Johnson, *Trials and Tribulations: The Trial Tax and the Process of Punishment*, 48 Crime & Just. 313, 314 (2019). These estimates vary, but "typically involve two-to-six-fold increases in the odds of imprisonment with 15-60 percent longer sentence lengths.'" *Id.*; *see also Shaw v. United States*, 489 F. Supp. 3d 944, 959 (E.D. Mich. 2020). For this reason, guilty pleas have replaced trials

---

[4] *See* National Association of Criminal Defense Lawyers (NACDL), *The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save it*, pg. 6 (2018) available at: https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and-how-to-save-it.pdf (last visited Apr. 30, 2024) (Hereinafter "The Trial Penalty").

14

as "individuals who choose to exercise their Sixth Amendment right to trial face exponentially higher sentences if they invoke the right to trial and lose."[5]

The Sentencing Commission has likewise confirmed such existence of the "trial tax." "In 2015, in primary offense categories, the average post-trial sentence was more than triple the average post-plea sentence." *Id.* at 15. For example, the average sentence for a defendant charged with fraud was three times higher for defendants who went to trial as opposed to those defendants who pled guilty. *Id.* at 17 (citing United States Sentencing Commissions datafiles for individual offenders, available at: https://www.ussc.gov/research/datafiles/commission-datafiles (last visited Apr. 29, 2024)). Statistics such as this indicate that defendants are in fact being penalized for going to trial. *Id.*

Moreover, Defendants are not only penalized for going to trial, but defendants are also *incentivized* to waive trial rights with a promise of leniency. As demonstrated in the below graph, unwarranted sentencing disparities exist across drug offenses, firearms offenses, and fraud offenses[6]:



---

[5] NACDL, The Trial Penalty, *supra* at 6.
[6] *See* The Trial Penalty, Figure 1.

15

As the graph shows, the average sentence received by a defendant who pled guilty was significantly less than the defendant who exercised his or her right to a trial, even when accounting for the three-level acceptance of responsibility credit.

The imposition of a guideline sentence in this case would unfairly punish Mr. D'Ambrosio for exercising his constitutional right to trial. It does not further the sentencing goals set forth in § 3553(a)(2), and for all of these reasons, a sentence below the probation officer's recommendation is warranted.

### E. A Lenient Sentence Will be Sufficient to Comply with the Factors Set Forth in 18 U.S.C. § 3553(a)(3)

18 U.S.C. § 3553(a)(3) requires Courts to consider "the kinds of sentences available." Probation and other non-custodial sentencing options are available to the Court here, and with the right set of conditions, would not constitute a "slap on the wrist" or otherwise fail to promote respect for the law. There are several onerous conditions the Court can include in such an order, for example, by requiring a period of home detention or home confinement as part of the sentence. *See* 18 U.S.C. § 3563(b)(19). In any event, as the Supreme Court explained in *Gall*:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court. *Gall,* 128 S. Ct at 595-96.

### F. The Need to Avoid Unwarranted Sentencing Disparities 18 U.S.C. § 3553(a)(6)

As this Court is no doubt aware, the largest tax fraud prosecuted in this district involved Beanie Baby millionaire Ty Warner. He failed to report over $24 million in stuffed-animal related

16

income and evaded taxes of more than $5.6 million. His sentence was probation.[7] Sentencing Mr. D'Ambrosio to jail for the same crime, despite a tax loss that totaled only 3% of Mr. Warner's, would risk a disparity.

Likewise, famous restauranteur Tony Hu defrauded the IRS of over $1 million in taxes. He received the same sentence that probation proposes in this case, a year-and-a-day in jail.[8] Chun Xu Zhang, another restauranteur caught up in the same high-profile sweep, received a fine only with no term of probation from Judge Norgle, despite also defrauding the IRS of just under $1 million in taxes. *See United States v. Zhang,* 18 CR 476, Dkt. # 30, 45.

The above examples total only three in number, but they were not cherry picked—they were among the more high-profile recent tax fraud prosecutions in this district—and the fact remains that below-guidelines sentences have become the norm in this district across offense categories. *See, e.g.*, United States Sentencing Commission, 2023 Federal Sentencing Statistics, *available at* https://tinyurl.com/ufnf8xvk (last accessed May 2, 2024). Giving Mr. D'Ambrosio a custodial sentence, let alone the one recommended by the probation officer or within the guidelines range, would risk a disparity.

### G. The Court Should Consider the Civil Penalties D'Ambrosio s Likely to Face Before Imposing a Fine

The probation office recommended a fine of $25,000. That is a logical recommendation based on the black and white reading of D'Ambrosio's income. After paying his tax liability for 2023 and restitution in this case, D'Ambrosio's cash assets will be $517,692. That said, he is going to face

---

[7] *See* Department of Justice, H. Ty Warner Sentenced. . . *available at* https://tinyurl.com/4j6rep7d (last accessed May 14, 2024).
[8] *See* Biz Journals, Restauranter Tony Hu Sentenced to Federal Prison for Tax Evasion, *available at* https://tinyurl.com/35rekrrk (last accessed May 14, 2024).

17

significant fraud penalties for 2019-2020 tax returns from the IRS, typically 75 percent of the tax loss. *See* https://www.irs.gov/pub/irs-pdf/n746.pdf. He is also going to face late fees for his more recent tax returns, which will be around 25 percent of the amounts owed for each year. *See* https://www.irs.gov/payments/failure-to-file-penalty. And then there will be draconian interest on top of everything, which can add up to another 25 percent per year.[9]

It appears therefore that the financial penalty is coming for Mr. D'Ambrosio. It is not likely that he will have much, of any, of that $517,000 left after the IRS gets through with him, and that reality of the situation should be factored into any financial component of his eventual sentence.

## IV. Conclusion

Nikko D'Ambrosio is a young man who has accomplished a lot of good in his young life. He is also now someone whose biggest mistakes in life have resulted in a felony conviction. Nonetheless, for the reasons set forth herein, Mr. D'Ambrosio is deserving of compassion and leniency from this Court. After considering the guidelines as a "starting point" and "initial benchmark," the Presentence Investigation Report, the information adduced at the sentencing hearing, and everything else this Court is required to consider, counsel respectfully submits that this Court impose a sentence below the probation officer's recommendation of one-year-and-one-day in custody.

---

[9] *See* IRS, Topic no. 653, IRS notices and bills, penalties, and interest charges, *available at* https://tinyurl.com/492rxtzu (last accessed May 14, 2024).

Respectfully submitted,

/s/ Christopher T. Grohman
**Christopher T. Grohman**

/s/ Ryan J. Levitt
**Ryan J. Levitt,**
Attorneys for Defendant.

Christopher T. Grohman
Ryan J. Levitt
**Benesch, Friedlander, Coplan, & Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
312.212.4943
cgrohman@beneschlaw.com
rlevitt@beneschlaw.com