**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NIKKO D'AMBROSIO, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 24-cv-678 |
| | ) | |
| META PLATFORMS, INC., *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Plaintiff, Nikko D'Ambrosio, respectfully submits this response in opposition to

Defendant Meta Platforms, Inc.'s ("Meta") Defendants Spill the Tea, Inc., Paola Sanchez, and

Blake Millbrand's, Defendants Carol Rajala and Rodney Rajala, and Defendant Abbigail Rajala's

Motions to Dismiss Plaintiff's Second Amended Complaint, respectfully and collectively.

## I.    INTRODUCTION

This case involves a coordinated and malicious effort by all Defendants—Spill the Tea,

Inc., its principals Paola Sanchez and Blake Milbrand, Meta Platforms, Inc., and individual

contributors, including Abbigail Rajala, Carol and Rodney Rajala, and other unnamed Jane

Does—to defame the Plaintiff, Nikko D'Ambrosio, misappropriate his intellectual property, and

expose his private information through the online platform "Are We Dating the Same Guy?" (the

"AWDTSG").

This case underscores Meta Platforms, Inc.'s ("Meta") active role in curating, amplifying,

and profiting from harmful content via its proprietary algorithms and generative AI tools. By

transforming user-submitted content into derivative works and prioritizing high-engagement

posts, Meta has forfeited its claim to immunity under Section 230 of the Communications

Decency Act ("CDA"). Meta's deliberate algorithmic decisions, driven by financial incentives,

expose its liability for the amplified defamation, reputational harm, and financial losses suffered by Plaintiff Nikko D'Ambrosio.

Meta Platforms, Inc., the operator of Facebook, is accused of amplifying and facilitating the dissemination of defamatory and harmful content targeting Plaintiff Nikko D'Ambrosio through its algorithms and infrastructure, specifically in the Facebook group "Are We Dating the Same Guy? | Chicago." The Plaintiff alleges that Meta's recommendation systems actively promoted defamatory posts and unauthorized uses of his likeness, enabling the widespread circulation of false statements and private information to a large audience. Despite being notified of the harmful content, Meta allegedly failed to take action, contributing to the reputational damage, emotional distress, and financial harm suffered by the Plaintiff. By prioritizing user engagement and ad revenue over content moderation, Meta is accused of acting with reckless disregard for the foreseeable harm caused by its platform, demanding accountability under Illinois law and principles of corporate responsibility.

Frances Haugen, a former Facebook employee who disclosed extensive internal data, testified before Congress that Meta's algorithms amplify harmful and divisive content for profit. Haugen confirmed that these algorithms systematically prioritize engagement-driven posts, regardless of their harmful effects, aligning with Plaintiff's allegation that Meta actively curates and promotes defamatory material targeting him. Haugen emphasized that Meta's financial model prioritizes profits over user safety, underscoring the platform's role in amplifying the harmful content at issue in this case (**Exhibit A**, *Statement of Frances Haugen to the United States Senate Committee on Commerce, Science and Transportation*).

In response to these allegations, Meta files their Motion to Dismiss which is predicated on the argument that it is immune from liability under Section 230 of the CDA and protected by the

First Amendment. However, Plaintiff has adequately alleged that Meta is not entitled to Section 230 immunity because it went beyond passive hosting by actively amplifying defamatory and tortious content through its algorithms, failing to properly moderate harmful materials, and benefiting financially from increased engagement. Furthermore, the First Amendment does not shield Meta from liability for harmful content generated or amplified by its algorithms when such amplification constitutes active participation.

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted only in the rare instance where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard, which ensures access to the courts for claims that are factually supported, does not demand the plaintiff prove their case at the pleading stage. Rather, it requires the plaintiff to articulate sufficient factual matter to allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

The Supreme Court has made clear that this standard does not impose a heightened pleading requirement. A complaint need not contain detailed factual allegations, nor is the plaintiff required to provide evidence or prove their claims at this stage. Instead, the court must focus on the allegations as pleaded and accept them as true, giving the plaintiff the benefit of every reasonable inference that can be drawn in their favor. See *Twombly*, 550 U.S. at 555. This deferential approach ensures that potentially meritorious claims are not prematurely dismissed before the parties have had the opportunity to develop the facts through discovery

Dismissal under Rule 12(b)(6) is particularly inappropriate when the allegations present a plausible basis for relief, even if ultimate success on the merits remains uncertain. The court's role at this stage is not to evaluate the strength of the evidence or resolve factual disputes but simply to determine whether the facts alleged, if proven, would entitle the plaintiff to relief under the law. Where the complaint alleges conduct that, if true, would constitute a violation of the law, the motion to dismiss must be denied.

Plaintiff has pleaded detailed factual allegations that, when taken as true, provide a clear and plausible foundation for relief. The Court must accept these allegations as true and draw all reasonable inferences in Plaintiff's favor. Defendants' attempt to argue otherwise misapplies the Rule 12(b)(6) standard and seeks to litigate factual disputes that are inappropriate for resolution at this preliminary stage. Accordingly, their motion to dismiss must be denied, and Plaintiff's claims allowed to proceed.

## III.    ARGUMENT

### META IS NOT IMMUNE UNDER SECTION 230 OF THE COMMUNICATIONS DECENCY ACT

Meta's reliance on Section 230 fails because it actively contributed to the development, dissemination, and amplification of harmful content. Courts have consistently held that platforms lose Section 230 immunity when they move beyond passive hosting and materially contribute to harmful activity.

### A.    Meta's Algorithms Actively Curate and Amplify Harmful Content

Meta's proprietary algorithms, including Relevancy Scores (**Exhibit B**, *Relevance Score for Facebook Ads – Meta for Business*), and "Story Bumping," (**Exhibit C**, *Showing More Timely Stories from Friends and Pages – Meta Newsroom*), go beyond passive hosting by

actively prioritizing and amplifying high-engagement content, including harmful posts. These features assign engagement-based scores to content, amplifying posts that generate likes, comments, and shares. These features use "Story Bumping" to resurface older content and increase its visibility, ensuring sustained engagement. And finally, these features amplify content likely to provoke user responses, even if defamatory or harmful.

Meta's story bumping isn't just a feature—it's a strategic algorithmic content amplification tool that directly ties their content creation and development efforts to sustained user engagement. Through news feed ranking and engagement prioritization, Meta's algorithms manufacture virality by selectively resurfacing posts based on real-time interactions, ensuring that content remains active beyond its natural lifespan.

This isn't passive content sorting—it's an engineered feedback loop where Meta's own algorithms dictate what gets seen, when, and by whom—in effect, making them co-creators of engagement-driven content. By dynamically bumping older posts back into circulation, they shape narratives, influence discourse, and extend the shelf life of user-generated material, turning fleeting interactions into long-term content cycles.

This algorithmic intervention transforms Meta from a mere platform into an active participant in content propagation—an entity that doesn't just host content but curates, amplifies, and monetizes it through artificial engagement signals.

Meta's editorial judgments, encoded into its algorithms, demonstrate active involvement in disseminating harmful content, removing it from Section 230 protection. In *Lemmon v. Snap Inc.,* 995 F.3d 1085 (9th Cir. 2021), the court held that Snapchat's speed filter, which incentivized dangerous behavior, was a design feature outside Section 230 immunity. Similarly,

Meta's algorithms incentivize the visibility of harmful content, directly contributing to Plaintiff's harm.

Meta's algorithms systematically prioritize and amplify content based on engagement metrics, such as likes, shares, and comments. These algorithms assign relevance scores and elevate high-engagement content—regardless of its harmful or defamatory nature—to increase user activity and advertising revenue. By curating and amplifying content, Meta exercises editorial judgment, removing its conduct from the protections afforded under Section 230(c)(1).

Meta's algorithmic amplification of harmful content is not an isolated claim. Frances Haugen's testimony before Congress highlighted that Facebook's leadership deliberately designed its algorithms to maximize engagement, even when it resulted in harm. She testified, "The result has been a system that amplifies division, extremism, and polarization," a direct consequence of Meta's profit-driven algorithms. Haugen further stated that Facebook's internal research confirms its algorithms cause harm, mirroring Plaintiff's allegation that Meta actively contributed to the dissemination of defamatory material about him.

**B.**     **Meta's Financial Incentives Align with Content Amplification**

Meta's financial model is directly tied to the amplification of high-engagement posts, including harmful and defamatory content. Plaintiff alleges that Meta's algorithms deliberately prioritize posts with higher engagement potential, even when those posts are harmful or defamatory. This prioritization strategy drives user activity and generates greater advertising revenue, demonstrating that Meta's content moderation decisions are not neutral but instead profit-driven.

Meta employs algorithms such as Story Bumping and Relevancy Scores, which assign engagement-based scores to content, surfacing posts likely to attract more likes, shares, and comments. Features like "Story Bumping" ensure that older, highly engaging posts—including defamatory ones—are resurfaced to sustain visibility and user interaction. This algorithmic design incentivizes the promotion of controversial content, increasing the likelihood that harmful posts will be amplified and monetized. Such practices undermine the claim that Meta is a passive intermediary under Section 230.

Courts have consistently recognized that platforms lose Section 230 immunity when their financial incentives align with harmful content amplification. For instance, in *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024), the court held that a platform's financial model tied to maximizing engagement through harmful content weakened its immunity claim. Similarly, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009), supports the principle that platforms lose immunity when they contribute to the development of harmful content. Meta's intentional prioritization of high-engagement posts—including defamatory content—establishes an active role in the development and dissemination of harmful speech, removing it from Section 230 protections.

Haugen testified that Meta's business model "pays for its profits with our safety," prioritizing high-engagement posts for ad revenue. This testimony substantiates Plaintiff's claims that Meta's amplification of harmful content is profit-driven. Haugen described how Meta's systems intentionally promote controversial content to increase user interaction, aligning with Plaintiff's allegations that Meta's algorithms amplified defamatory content to maximize engagement and revenue.

The Plaintiff further contends that Meta's profit-driven amplification demonstrates editorial judgment, as the platform makes calculated decisions about which posts to prioritize based on revenue potential. These actions are far from neutral hosting; they constitute active participation in content dissemination for financial gain. Meta's reliance on Section 230 immunity is therefore unavailing when its content amplification practices are directly tied to its profit motives.

**C.      Meta's Algorithms Create Derivative Works**

Meta's use of generative AI tools and algorithmic features goes beyond passive hosting by actively transforming user-submitted content into derivative works. These tools, including automated animations, "Story Bumping," and 3D enhancements, modify user-generated posts to make them more engaging, visually appealing, and shareable. By altering the original content, Meta actively participates in the development and creation of new, derivative content.

Features like "Story Bumping" resurface older posts that generate high engagement, increasing their visibility and ensuring prolonged user interaction. This algorithmic manipulation effectively repackages content for a new audience, altering its presentation and reach. Generative AI features, such as "Make It 3D" animations, create entirely new formats from static user submissions. These transformations align with the statutory definition of an "information content provider" under Section 230(c)(1).

Platforms lose Section 230 immunity when they co-create or develop user content. For example, in *Barnes,* 570 F.3d at 1101, the court held that platforms are no longer passive intermediaries when they contribute to the creation or enhancement of content. Similarly, in *Lemmon v. Snap Inc.*, 995 F.3d 1085 (9th Cir. 2021), the court found that design features

8

encouraging specific user behaviors constituted active participation, disqualifying the platform from immunity.

Meta's generative AI tools exemplify this principle. By using features that transform and reformat content, Meta creates derivative works that are distinct from the original submissions. These tools enhance the visibility, engagement, and profitability of harmful posts, underscoring Meta's active involvement in content development. These actions remove Meta's protections under Section 230 and establish its role as an "information content provider."

Haugen testified that Meta's closed design shields its operations from meaningful oversight, including its own Oversight Board. She compared this lack of transparency to regulating cars without crash tests, underscoring that regulators and courts cannot evaluate the harm caused by Meta's algorithms without direct access to its internal data. Plaintiff's allegations of Meta's closed systems align with this testimony, further supporting the necessity for transparency and judicial scrutiny.

**D.      IRPA Claims Are Not Preempted by Section 230**

Section 230(e)(2) explicitly excludes intellectual property claims from its scope. IRPA, as a statute protecting the commercial use of a person's identity, qualifies as intellectual property law. *See Lukis v. Whitepages Inc.,* 549 F. Supp. 3d 798, 805 (N.D. Ill. 2021). Plaintiff's IRPA claim alleges that Meta monetized Plaintiff's identity without authorization, removing it from Section 230 immunity.

**E.      Discovery Is Necessary to Resolve Factual Issues**

Meta's arguments hinge on factual issues that necessitate discovery to resolve. Plaintiff seeks discovery to uncover critical evidence demonstrating Meta's active role in amplifying

harmful content and its financial incentives to do so. This evidence is essential to establishing that Meta went beyond passive hosting, actively contributing to the creation and dissemination of harmful content, disqualifying it from Section 230 immunity.

Meta's algorithms, including Relevancy Scores and Story Bumping, actively curate and amplify high-engagement posts, regardless of their harmful nature. Plaintiff seeks internal engineering specifications detailing how these algorithms assign relevance scores, prioritize certain posts, and resurface older content for continued visibility. Additional evidence, such as testing data and internal studies on how these algorithmic adjustments impact user engagement and the visibility of harmful content, is also necessary. These records will demonstrate the deliberate algorithmic decisions to maximize engagement, even when the content poses reputational harm to individuals like the Plaintiff.

Plaintiff also seeks discovery into Meta's monetization strategies, which are directly tied to its content prioritization practices. Internal communications and financial models are critical to showing how amplified content, such as high-engagement defamatory posts, translates to increased advertising revenue. Analyses and reports quantifying the profitability of controversial posts, and data revealing how Meta prioritized posts with higher potential for ad revenue, will further establish the platform's financial incentives for amplifying harmful content.

Frances Haugen's disclosures reveal the significant gaps in public understanding of Meta's internal operations. Haugen testified that "almost no one outside of Facebook knows what happens inside Facebook," underscoring the necessity of discovery to assess Meta's active role in content amplification and the financial incentives underpinning its algorithms. Her testimony demonstrates that Meta's internal research confirms the harm caused by its platform, making discovery essential to uncover this information for Plaintiff's claims.

Meta's use of generative AI tools, such as "Make It 3D" and automated animations, represents another area requiring discovery. These tools transform user-submitted content into derivative works, creating distinct and enhanced iterations of the original posts. Discovery is necessary to obtain documentation of AI-driven content modifications, communications regarding the development and deployment of generative AI tools, and records demonstrating how AI-enhanced content differs from original user submissions. This evidence will show how Meta's generative AI tools disqualify it from Section 230 immunity by making the platform an "information content provider."

Finally, Plaintiff seeks discovery into Meta's knowledge of the harm caused by its platform and its inaction in addressing these issues. Plaintiff requests reports, complaints, and notifications submitted to Meta regarding harmful posts in the "Are We Dating the Same Guy?" Facebook group, as well as internal communications discussing the risks of prioritizing high-engagement content. Meta's responses—or lack thereof—to such notifications are critical to establishing its knowledge of the harm caused to individuals, including the Plaintiff.

Discovery is critical to Plaintiff's case because it will reveal the extent of Meta's active participation in content amplification, its financial incentives to amplify harmful posts, and its knowledge of the harm caused by its platform. Courts have recognized the importance of discovery in cases where platforms' internal processes are central to determining their immunity under Section 230. See *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (discovery required to assess the role of algorithms in content creation). This requested discovery will allow Plaintiff to demonstrate that Meta's conduct disqualifies it from Section 230 immunity and establishes its liability for the harm suffered by Plaintiff.

## PLAINTIFF'S CLAIMS ARE VIABLE UNDER STATE LAW

### A.    Illinois Right of Publicity Act

Meta improperly used Plaintiff's identity, including his photograph and personal information, to drive user engagement and generate advertising revenue. Such unauthorized commercial use violates IRPA. Courts have recognized that monetized uses of identity satisfy IRPA's commercial purpose requirement. *See Lukis* 549 F. Supp. 3d at 805.

### B.    Defamation

Meta's amplification of posts imputing criminal behavior alleging rape by the Plaintiff and harming his professional reputation satisfies the threshold for defamation per se under Illinois law. Additionally, Plaintiff adequately pleads defamation per quod by detailing specific damages, including lost professional opportunities and reputational harm, in compliance with the heightened pleading standard of Rule 9(g).

### C.    False Light Invasion of Privacy

Meta amplified content that cast Plaintiff in a false light, portraying him as dangerous and untrustworthy. These actions caused reputational and emotional harm, and Meta's editorial decisions demonstrate actual malice.

### D.    Negligence and Negligent Entrustment

Plaintiff has also sufficiently pleaded negligence, alleging that Meta failed to exercise reasonable care in both moderating harmful content and designing algorithms that amplified defamatory materials. Courts have increasingly recognized that platforms may be held liable for negligence when they engage in conduct beyond mere passive hosting. Plaintiff alleges that Meta's

algorithms prioritized harmful content targeting him, and that Meta failed to take reasonable measures to mitigate or prevent this harm. These allegations of active involvement and failure to exercise reasonable care are more than sufficient to state a claim for negligence.

**E.     Unjust Enrichment**

Meta profited unjustly by monetizing harmful posts at Plaintiff's expense. Illinois law permits recovery where a defendant gains financial benefits through wrongful conduct. *See Vanzant v. Hill's Pet Nutrition, Inc*., 934 F.3d 730, 739 (7th Cir. 2019).

## META'S FIRST AMENDMENT DEFENSE IS UNFOUNDED

Meta's amplification of harmful content is not protected under the First Amendment. Defamatory speech, particularly when amplified for profit, falls outside the scope of First Amendment protections. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974). Furthermore, Meta's algorithmic curation and promotion of harmful content constitute active participation rather than neutral moderation, disqualifying it from constitutional safeguards for editorial discretion.

## DISCOVERY IS NECESSARY TO RESOLVE FACTUAL ISSUES

Meta's arguments hinge on factual issues that necessitate discovery to resolve. Plaintiff seeks internal documents detailing how Meta's algorithms prioritized AWDTSG content, data demonstrating Meta's knowledge of harmful activity within the group, and communications related to monetization strategies tied to high-engagement posts. This evidence is critical to understanding the extent of Meta's role in amplifying and profiting from harmful content.

**A.     Section 230 of the Communications Decency Act Does Not Bar Plaintiff's Claims**

Under Section 230(f)(3), a party loses immunity when it is responsible "in whole or in part" for the "creation or development" of content. *See Fair Housing Council of San Fernando Valley, LLC,* 521 F.3d at 1168. Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand did more than passively host content. The SAC alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand edited, curated, and moderated content to ensure it complied with their group's defamatory objectives, assisting users in circumventing liability (SAC, ¶ 20). Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand manually reviewed and approved posts, including those defaming Plaintiff, demonstrating active participation (SAC, ¶¶ 5, 55-56). Additionally, Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand explicitly encouraged the posting of defamatory and infringing material by providing "guidelines" on how to avoid detection while maintaining inflammatory content. These facts demonstrate that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand acted as information content providers and are therefore ineligible for immunity under Section 230.

Section 230(e)(2) explicitly excludes intellectual property claims from immunity. Plaintiff's claim under the Illinois Right of Publicity Act (IRPA) is rooted in the unauthorized commercial use of his likeness for fundraising and user engagement. Courts recognize that IRPA claims fall under the intellectual property exception. See *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1103 (7th Cir. 2022). Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand's use of Plaintiff's photograph alongside defamatory posts to monetize the group directly implicates this exception (SAC, ¶¶ 31, 81).

**B.     Plaintiff States a Plausible Claim for Defamation**

Plaintiff identifies specific false statements, including allegations falsely associating Plaintiff with criminal conduct (sexual assault charges against "Anthony LaMonica") (SAC, ¶¶ 46, 50-52, 93) and statements implying Plaintiff's cruelty and dishonesty (SAC, ¶¶ 13, 19, 53). These statements are defamatory *per se* as they impute criminal activity and harm Plaintiff's professional reputation. Unlike generalized opinions, these statements assert or imply verifiable facts.

Statements of opinion lose protection when they imply underlying false facts. See *Madison v. Frazier*, 539 F.3d 646, 655 (7th Cir. 2008). By linking Plaintiff to criminal allegations and falsely portraying him as abusive, Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand crossed this line. The defamatory nature of these statements is further underscored by their publication alongside Plaintiff's photograph, amplifying the false factual implications.

Plaintiff has also alleged economic losses, including harm to his professional reputation and lost business opportunities, satisfying the heightened pleading standard for defamation per quod (SAC, ¶ 162).

## C.     Plaintiff States a Valid Claim Under the Doxing Act

Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand published Plaintiff's photograph, full name, and employment details to an online group with over 100,000 members. These details fall squarely within the definition of Personally Identifiable Information (PII) under 740 ILCS 195/15 (SAC, ¶¶ 46, 104-105).

The SAC plausibly alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand's actions exposed Plaintiff to a realistic threat of harassment, stalking, or violence. For

instance, commenters requested details about Plaintiff's employer, amplifying the risk of harm (SAC, ¶ 47). Additionally, Plaintiff describes significant emotional and psychological harm caused by Defendants' conduct (SAC, ¶¶ 66-67, 105-106). These allegations are specific and sufficient to state a claim.

**D.      The Illinois Right of Publicity Act Claim is Properly Pled**

Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand's use of Plaintiff's photograph to attract users and monetize their platform constitutes "commercial use" under IRPA. See 765 ILCS 1075/5. Plaintiff alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand raised $55,000 via a GoFundMe campaign prominently featuring Plaintiff's likeness without authorization (SAC, ¶¶ 31, 81). These facts satisfy the statutory elements.

**E.      Plaintiff States a Viable Claim for False Light**

Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand placed Plaintiff in a false light by portraying him as a criminal and morally reprehensible individual. These misrepresentations are "highly offensive to a reasonable person" and were published with reckless disregard for their falsity (SAC, ¶¶ 108-110). The false light claim is independent of the defamation claim and requires no additional factual support. See *Osundairo v. Geragos*, 447 F. Supp. 3d 727, 738 (N.D. Ill. 2020).

**F.      Plaintiff Sufficiently Pleads Unjust Enrichment**

Plaintiff alleges that Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand profited through crowdfunding and advertising revenue generated by exploiting Plaintiff's likeness and defamatory content (SAC, ¶¶ 81, 87). Retaining these benefits would unjustly

enrich Defendants Spill the Tea, Inc., Paola Sanchez, and Blake Millbrand at Plaintiff's expense.

*See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 678-79 (Ill. 1989).

## G. Plaintiff Has Properly Pleaded a Claim Under the Illinois Right of Publicity Act (IRPA)

### 1. Commercial Use of Plaintiff's Likeness

Defendant Abbigail Rajala's claim that her actions do not constitute "commercial use" ignores the allegations in ¶¶ 46, 79–81 of the Second Amended Complaint, which detail how Plaintiff's photograph and likeness were republished in a monetized forum for the benefit of its administrators. Specifically, Defendant Abbigail Rajala's republication was on a platform where administrators solicited donations, subscriptions, and crowdfunding (¶¶ 16, 28, 31). The platform used Plaintiff's likeness to drive user engagement, which was directly tied to advertising revenue (¶¶ 28, 81).

### 2. IRPA Exemptions Do Not Apply

Defendant Abbigail Rajala's reliance on the statutory exemption under 765 ILCS 1075/35(b)(1) is misplaced. The exemption applies only to non-commercial uses, whereas Plaintiff's allegations show Defendant Abbigail Rajala's actions were inextricably linked to the group's profit motives (¶¶ 16, 28, 81). These facts, when taken as true, render the exemption inapplicable.

### 3. Defendant's Intent to Exploit Plaintiff's Likeness

The Complaint alleges Defendant Abbigail Rajala republished Plaintiff's photograph and defamatory statements with the intent to harm Plaintiff's reputation and incite further

engagement within the group, which directly benefited its monetization efforts (¶¶ 46, 81). This intent is sufficient under the IRPA.

Illinois law defines "commercial use" broadly to encompass any use intended to generate economic benefit (*Blair v. Nev. Landing P'ship,* 369 Ill. App. 3d 318, 321 (2006)). Defendant's conduct falls squarely within this definition.

## H.    Plaintiff Has Sufficiently Pleaded Defamation Per Se and Per Quod

### 1.    Defamatory Statements Are Actionable

Defendant Abbigail Rajala argues the statements are mere opinions. However, the Complaint identifies specific false and defamatory statements, including:

i.    Implying Plaintiff was accused of criminal sexual assault by equating him with a different individual (¶ 51); and

ii.    Statements characterizing Plaintiff as dishonest and immoral (¶¶ 46, 91–92).

These statements are actionable because they imply verifiable false facts and directly impute criminal activity and lack of integrity, which are defamatory per se (*Bryson v. News Am. Publs., Inc.*, 174 Ill. 2d 77, 88 (1996)).

### 2.    Sufficient Allegations of Damages

For defamation per quod, the Complaint pleads specific damages, including reputational harm, emotional distress, and loss of professional opportunities (¶¶ 85, 102, 162). These allegations meet the requirement to plead special damages, as they detail the specific harm Plaintiff suffered.

**I.      Plaintiff Has Properly Pleaded False Light and Civil Conspiracy Claims**

**1.      False Light**

Defendant Abbigail Rajala's publication of Plaintiff's photograph and statements created a false impression of criminality and immorality (¶¶ 108–110). The Complaint alleges Defendant acted with actual malice, knowing the statements were false or with reckless disregard for their truth (*Lovgren v. Citizens First Nat'l Bank of Princeton*, 126 Ill. 2d 411, 418 (1989)).

**2.      Civil Conspiracy**

Defendant Abbigail Rajala's participation in the group's coordinated campaign of harassment is detailed in ¶¶ 115–117. The Complaint alleges overt acts by Defendant, including republishing defamatory content (¶ 46) and contributing to a scheme designed to harm Plaintiff's reputation for the group's financial gain. These allegations satisfy the elements of conspiracy under Illinois law (*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999)).

**J.      Plaintiff Has Pleaded a Viable Claim Under the Illinois Doxing Act**

The Complaint sufficiently alleges all elements of a claim under 740 ILCS 195/15:

i.      Defendant Abbigail Rajala published Plaintiff's photograph and identifying information in a forum designed to harass and belittle men (¶¶ 46, 104).

ii.      Defendant Abbigail Rajala acted with intent to harm Plaintiff, as evidenced by her targeting him within a group known for inciting harassment (¶ 105).

iii. Plaintiff suffered substantial emotional distress and life disruption as a direct result (¶¶ 105–106).

These allegations are plausible under the statutory framework.

**K.      Plaintiff's Unjust Enrichment Claim Is Properly Pleaded**

Defendant Abbigail Rajala's argument that unjust enrichment is not an independent cause of action ignores its derivative nature in this case. Illinois law permits unjust enrichment claims when tied to underlying tortious conduct (*Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011)). Defendant's wrongful use of Plaintiff's likeness and defamatory actions unjustly enriched her and the group's administrators at Plaintiff's expense (¶¶ 87–88).

**L.      Meta's Algorithmic Amplification Claim**

The Complaint alleges Meta's algorithms actively amplified harmful content, turning it into first-party speech (¶¶ 61–74). While § 230 of the Communications Decency Act generally shields platforms from liability, Plaintiff plausibly alleges that Meta went beyond passive hosting by curating and promoting the defamatory content. Courts have recognized exceptions to § 230 where platforms contribute materially to harmful content (*Fair Hous. Council of San Fernando Valley*, 521 F.3d at 1162. Meta's actions fall within this exception.

**M.      The Complaint Plausibly Alleges Defendants Carol and Rodney Rajalas' Violation of the Illinois Right to Publicity Act.**

Contrary to Defendants Carol and Rodney Rajalas' assertion, Plaintiff has alleged facts sufficient to establish the elements of a claim under the IRPA. To state a claim, a plaintiff must allege: (1) an appropriation of their identity, (2) without written consent, and (3) for a

commercial purpose. *Huston v. Hearst Commc'ns Inc.*, 53 F.4th 1097, 1099 (7th Cir. 2022). Plaintiff's Complaint satisfies each of these elements.

Defendants Carol and Rodney Rajalas' network facilitated the unauthorized use of Plaintiff's identity. Plaintiff alleges that Defendants knowingly permitted the unauthorized distribution of his intellectual property and personally identifiable information through their internet network. The Complaint specifically states that Defendants "maintained, owned, and controlled" the network used for these unauthorized actions (Compl. ¶ 48). Defendants' assertion that their involvement is speculative is misplaced at the pleading stage, where all reasonable inferences are drawn in Plaintiff's favor.

Moreover, Commercial purpose is adequately pled adequately**.** Plaintiff alleges that his photograph and other intellectual property were posted in the "Are We Dating the Same Guy" Facebook group, a forum with inherently commercial undertones as it generates revenue for Meta through advertising and user engagement. Moreover, Defendants Carol and Rodney Rajalas' failure to prevent or stop the redistribution aligns with the IRPA's expansive definition of commercial purpose. At the motion-to-dismiss stage, whether the usage qualifies as commercial is a factual determination inappropriate for resolution now.

Defendants Carol and Rodney Rajalas' argument conflates liability under the IRPA with direct action. Defendants Carol and Rodney Rajalas erroneously argue that the IRPA claim requires them to have personally posted Plaintiff's image. The IRPA, however, extends liability to those who enable or facilitate the unauthorized use of another's identity, especially when that facilitation is through a system under their control. Here, Defendants are alleged to have knowingly maintained the means of the unauthorized use and benefited indirectly through their acquiescence.

**N.      The Complaint Properly Alleges Unjust Enrichment.**

Defendants Carol and Rodney Rajalas' motion misunderstands Illinois law on unjust enrichment. While unjust enrichment is not an independent cause of action, it serves as a remedial theory tethered to a substantive claim. See *Vanzant* 934 F.3d at 739. Here, Plaintiff's IRPA claim provides the underlying basis for his unjust enrichment allegation.

Here, Enrichment is clearly alleged. The Complaint plausibly alleges that Defendants Carol and Rodney Rajalas were enriched by facilitating their daughter's defamatory and unauthorized activities, which accrued benefits in the form of public attention and online engagement.

The retention of benefits stemming from the exploitation of Plaintiff's intellectual property and personally identifiable information without his consent is plainly inequitable. At this stage, Plaintiff's allegations must be taken as true, and Defendants' factual disputes are premature.

**O.      The Motion to Dismiss Ignores the Plausibility Standard.**

Defendants Carol and Rodney Rajalas' misapply the pleading standard under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). At this stage, Plaintiff is required only to plead enough facts to state a claim that is "plausible on its face." *Id.* at 570. The Complaint exceeds this threshold by outlining specific actions by Defendants that facilitated the unauthorized use of Plaintiff's identity. Defendants' Carol and Rodney Rajalas' insistence on a heightened standard of proof is improper and unsupported.

**IV.      CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motions to dismiss in their entirety. Plaintiff's Second Amended Complaint pleads detailed, plausible, and factually supported claims against all Defendants under the Illinois Right of Publicity Act, for defamation, false light invasion of privacy, unjust enrichment, and related state law causes of action.

At this early stage of litigation, Defendants' arguments improperly conflate the pleading requirements under *Twombly* and *Iqbal* with evidentiary burdens reserved for later stages of the case. Defendants raise factual disputes and attempt to introduce defenses that are both premature and contrary to the procedural standards governing motions to dismiss. Courts consistently recognize that motions under Rule 12(b)(6) are not vehicles for resolving factual disputes or testing the sufficiency of evidence.

Plaintiff has alleged sufficient facts, which, when taken as true and construed in the light most favorable to him, demonstrate plausible entitlement to relief. Furthermore, if this Court finds any deficiencies in the pleadings, Plaintiff respectfully requests leave to amend the complaint to cure such issues in accordance with Rule 15(a)(2) of the Federal Rules of Civil Procedure, which provides that leave to amend "shall be freely given when justice so requires."

Frances Haugen's testimony to Congress reinforces Plaintiff's allegations that Meta's algorithmic decisions prioritize engagement over safety, actively amplifying harmful content for profit. As Haugen testified, Meta's profit-driven practices harm individuals and society, and Congress must intervene to regulate its systems. This testimony underscores the importance of holding Meta accountable for its role in amplifying harmful content that caused significant harm to Plaintiff.

Plaintiff looks forward to the opportunity to proceed to discovery, where the full extent of Defendants' misconduct and liability can be further illuminated. Accordingly, Plaintiff respectfully urges this Court to deny Defendants' motions and allow this matter to proceed on the merits.

Respectfully submitted,

*/s/ Marc P. Trent*

Attorney for Plaintiff

**TRENT LAW FIRM, P.C.**
Attorney No. 6324928
Marc P. Trent
600 W. Jackson Blvd #100
Chicago, IL 60661
service@trentlawfirm.com
Office: (630) 682-3100
Fax: (630) 682-3554
www.trentlawfirm.com

# Exhibit A



United States Senate Committee on Commerce, Science and Transportation

*Sub-Committee on Consumer Protection, Product Safety, and Data Security*

### <u>Statement of Frances Haugen</u>
### <u>October 4, 2021</u>

Chairman Blumenthal, Ranking Member Blackburn, and Members of the Subcommittee. Thank you for the opportunity to appear before you and for your interest in confronting one of the most urgent threats to the American people, to our children and our country's well-being, as well as to people and nations across the globe.

My name is Frances Haugen. I used to work at Facebook and joined because I think Facebook has the potential to bring out the best in us. But I am here today because I believe that Facebook's products harm children, stoke division, weaken our democracy and much more. The company's leadership knows ways to make Facebook and Instagram safer and won't make the necessary changes because they have put their immense profits before people. Congressional action is needed. They cannot solve this crisis without your help.

I believe that social media has the potential to enrich our lives and our society. We can have social media we enjoy — one that brings out the best in humanity. The Internet has enabled people around the world to receive and share information and ideas in ways never conceived of before. And while the Internet has the power to connect an increasingly globalized society, without careful and responsible development, the Internet can harm as much as it helps.

I have worked as a product manager at large tech companies since 2006, including Google, Pinterest, Yelp and Facebook. My job has largely focused on algorithmic products like Google+ Search and recommendation systems like the one that powers the Facebook News Feed. Working at four major tech companies that operate different types of social networks, I have been able to compare and contrast how each company approaches and deals with different challenges. The choices being made by Facebook's leadership are a huge problem — for children, for public safety, for democracy    that is why I came forward. And let's be clear: it doesn't have to be this way. We are here today because of deliberate choices Facebook has made.

I joined Facebook in 2019 because someone close to me was radicalized online. I felt compelled to take an active role in creating a better, less toxic Facebook. During my time at Facebook, first working as the lead product manager for Civic Misinformation and later on Counter-Espionage, I saw that Facebook repeatedly encountered conflicts between its own profits and our safety. *Facebook consistently resolved those conflicts in favor of its own profits.* The result has been a system that amplifies division, extremism, and polarization — and undermining societies around the world. In some cases, this dangerous online talk has led to actual violence that harms and even kills people. In other cases, their profit optimizing machine is generating self-harm and self-hate — especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research.

This is not simply a matter of some social media users being angry or unstable. Facebook became a $1 trillion company by *paying for its profits with our safety, including the safety of our children.* And that is unacceptable.

I believe what I did was right and necessary for the common good — but I know Facebook has infinite resources, which it could use to destroy me. I came forward because I recognized a frightening truth: almost no one outside of Facebook knows what happens inside Facebook. The company's leadership keeps vital information from the public, the U.S. government, its shareholders, and governments around the world. The documents I have provided prove that Facebook has repeatedly misled us about what its own research reveals about the safety of children, its role in spreading hateful and polarizing messages, and so much more. I appreciate the seriousness with which Members of Congress and the Securities and Exchange Commission are approaching these issues.

The severity of this crisis demands that we break out of previous regulatory frames. A critical starting point for effective regulation is transparency: full access to data for research not directed by Facebook. On this foundation, we can build sensible rules and standards to address consumer harms, illegal content, data protection, anticompetitive practices, algorithmic systems and more.

As long as Facebook is operating in the dark, it is accountable to no one. And it will continue to make choices that go against the common good. *Our common good*.

When we realized tobacco companies were hiding the harms it caused, the government took action. When we figured out cars were safer with seat belts, the government took action. And today, the government is taking action against companies that hid evidence on opioids.

I implore you to do the same here.

Right now, Facebook chooses what information billions of people see, shaping their perception of reality. Even those who don't use Facebook are impacted by the radicalization of people who do. A company with control over our deepest thoughts, feelings and behaviors needs real oversight.

*But Facebook's closed design means it has no oversight — even from its own Oversight Board, which is as blind as the public*. Only Facebook knows how it personalizes your feed for you. It hides behind walls that keep the eyes of researchers and regulators from understanding the true dynamics of the system. When the tobacco companies claimed that filtered cigarettes were safer for consumers, it was possible for scientists to independently invalidate that marketing message and confirm that in fact they posed a greater threat to human health.[1] But today we can't make this kind of independent assessment of Facebook. We have to just trust what Facebook says is true — and they have repeatedly proved that they do not deserve our blind faith.

This inability to see into the actual systems of Facebook and confirm that Facebook's systems work like they say is like the Department of Transportation regulating cars by watching them drive down the highway. Imagine if no regulator could ride in a car, pump up its wheels, crash test a car, or **even know that seat belts *could* exist**. Facebook's regulators can see some of the problems — but they are kept blind to what is causing them and thus can't craft specific solutions. They cannot even access the How is the public supposed to assess if Facebook is resolving conflicts of interest in a way that is aligned with the public good if it has no visibility and no context into how Facebook really operates?

This must change.

---

[1] James Hamblin. "If My Friend Smokes Sometimes, Should the Cigarettes Have Filters? An honest question." The Atlantic. https://www.theatlantic.com/health/archive/2017/07/cigarette-filters/533379/

Facebook wants you to believe that the problems we're talking about are unsolvable. They want you to believe in false choices. They want you to believe you must choose between connecting with those you love online and your personal privacy. That in order to share fun photos of your kids with old friends, you must also be inundated with misinformation. They want you to believe that this is just part of the deal. *I am here to tell you today that's not true. These problems are solvable. A safer, more enjoyable social media is possible.* But if there is one thing that I hope everyone takes away from these disclosures it is that Facebook chooses profit over safety every day — and without action, this will continue.

*Congress can change the rules Facebook plays by and stop the harm it is causing.*

I came forward, at great personal risk, because I believe we still have time to act. But we must act now.

Thank you.

Case: 1:24-cv-00678 Document #: 87 Filed: 01/30/25 Page 29 of 38 PageID #:656

# EXHIBIT B

∞ Meta    **Get started**    **Advertise**    **Learn**    **Support**    🔍    Start Now

***Update 08/08/2019: We replaced relevance score with ad relevance diagnostics to make diagnosing ad relevance clearer and more actionable.***

On Facebook, we try to show people the ads that are most pertinent to them. That's why we've always used relevance as a factor in determining how we deliver ads. Taking relevance into account helps ensure that people see ads that matter to them, leading to a better experience for people and businesses alike.

Beginning this week, we're going to start showing relevance scores as a visible metric in our ads reporting tools. Here's what advertisers should know.



## How relevance scores work

Relevance score is calculated based on the positive and negative feedback we expect an ad to receive from its target audience. The more positive interactions we expect an ad to receive, the higher the ad's relevance score will be. (Positive indicators vary depending on the ad's objective, but may include video views, conversions, etc.) The more times we expect people to hide or report an ad, the lower its score will be.

Ads receive a relevance score between 1 and 10, with 10 being the highest. The score is updated as people interact and provide feedback on the ad. Ads with guaranteed delivery — like those bought through reach

and frequency — are not impacted by relevance score. Relevance score has a smaller impact on cost and delivery in brand awareness campaigns, since those ads are optimized for reaching people, rather than driving a specific action like installs.

## Why relevance score matters


Understanding relevance scores helps advertisers in a few key ways:

**It can lower the cost of reaching people.** Put simply, the higher an ad's relevance score is, the less it will cost to be delivered. This is because our ad delivery system is designed to show the right content to the right people, and a high relevance score is seen by the system as a positive signal.

Of course, relevance isn't the only factor our ad delivery system considers. Bid matters too. For instance, if two ads are aimed at the same audience, there's no guarantee that the ad with an excellent relevance score and low bid will beat the ad with a good relevance score and high bid. But, overall, having strong relevance scores will help advertisers see more efficient delivery through our system.

**It can help advertisers test ad creative options before running a campaign.** Advertisers can test different combinations of image and copy with different audiences, and learn which combinations offer the highest relevance scores.

**It can help optimize campaigns already in progress.** While ad campaigns are running, advertisers can monitor their relevance scores. If a score begins to dip, it may be an indicator that the ad's creative or audience needs to be refreshed.

## How to use relevance scores

While understanding relevance scores has real benefits for advertisers, it's important to keep this metric in perspective. Relevance scores should not be used as the primary indicator of an ad's performance. As has long been the case on Facebook, the most important factor for success is bidding based on the business goal you hope to meet with an ad.

Say, for instance, you own a pizza shop and want to run a campaign that drives people to order through your website. Achieving the desired outcome — in this case, driving sales online — is ultimately more important than your relevance score. If you have an average score but your ad is working, you may not want to change anything. Or you may consider tweaking the ad to see how you can get lower cost of delivery by improving the relevance score. Or you might monitor your relevance score, along with the sales you're driving, to learn when it's time to update your campaign.

Use relevance scores as a way to reach your audiences at lower cost, and to test and learn about your ad creative and ad targeting. But understand that having a good relevance score is not an end unto itself.

## Getting started

1/28/25, 8:23 PM
Relevance score available for businesses
Case: 1:24-cv-00678 Document #: 87 Filed: 01/30/25 Page 31 of 38 PageID #:658

Relevance score rolls out globally starting this week; it can be viewed in any of our ads reporting tools and is also available through our ads API to our partners and ads API developers. To check your ads' scores, head to Ads Manager and add the relevance score tab to your ads report(s).

∞ Meta

**Get started**    **Advertise**    **Learn**    **Support**    🔍    **Start Now**

Every connection is an opportunity.
It's Your World.

∞ Meta

## Meta Technologies

## Tools

## Goals

## Business Types

## Industries

## Inspiration

## Skills and Training

Inspiration

Skills and Training

Guides and Resources

Business Help Center

 Meta

**Get started**     **Advertise**     **Learn**     **Support**          Start Now

© 2025 Meta

About     Developers     Careers     Privacy     Cookies     Terms     Help Center

English (US)     More languages

# EXHIBIT C

 Meta

Back to Newsroom

Facebook

# Showing More Timely Stories from Friends and Pages

September 18, 2014
Erich Owens and David Vickrey

*By Erich Owens, Software Engineer and David Vickrey, Engineering Manager*

Our goal with News Feed is to show everyone the right content at the right time so they don't miss the stories that are important to them. We've heard feedback that there are some instances where a post from a friend or a Page you are connected to is only interesting at a specific moment, for example when you are both watching the same sports game, or talking about the season premiere of a popular TV show. There are also times when a post that is a day or two old may not be relevant to you anymore. Our latest update to News Feed ranking looks at two new factors to determine if a story is more important in the moment than other types of updates.

**Factoring in trending topics**

One way we show timely content higher-up in News Feed is to show people stories about things that are trending as soon as they occur, so you can immediately know what your friends or favorite Pages are saying about the stories of the day. This

means that when a friend or Page you are connected to posts about something that is currently a hot topic of conversation on Facebook, that post is more likely to appear higher up in News Feed, so you can see it sooner. Early testing of a small percentage of posts has shown that this update on average leads to a more than 6% increase in people engaging with these stories (e.g., more people share, comment, like or click).



**Looking at when people like or comment**

The second update takes into account the rate at which people are liking or commenting on a post. Currently one of the signals we look at is the total number of likes that a post has received when determining how high up to to show it in News Feed. With this update, we are going to begin looking at *when* people are choosing to like, comment and share.

If people are engaging with the post right after it is posted, and not as much a few hours later, this suggests that the post was most interesting at the time it was posted, but potentially less interesting at a later date. Based on this signal it is more likely to appear higher in News Feed earlier on and lower at a later date.

We are also going to start taking this signal into account when considering which stories we bump in News Feed. Bumping is when we resurface stories that people did not scroll down far enough to see but are still getting lots of engagement. This is one more way that we're working to identify timely posts so we can show them

nearer the top of your News Feed sooner.

**Will this affect my Page?**

We will be rolling out these changes gradually and do not expect posts to see significant changes in distribution as a result of this update. If a Page posts about a trending topic or if a post sees a high velocity of engagement early on that then drops off, that post may begin to see increased distribution early on and less distribution over time. Pages should keep producing great content that is relevant and resonates with their audience.

Categories: Facebook, Inside Feed, News Feed FYI

Tags: News Feed, Pages, Trending

  

## RELATED NEWS

Instagram

## New Ways to Create Content on Instagram

We're sharing updates to reels, feed photos, carousels and stories that make it easier to create content.

November 15, 2023

### Related Pages

Facebook

## Topics

Company News

Technology and Innovation

Data and Privacy

Safety and Expression

Combating Misinformation

Economic Opportunity

Election Integrity

Strengthening Communities

Diversity and Inclusion

## Featured News

Meta

Reflecting on Meta's $8 Billion Investment in Privacy

January 28, 2025

Meta

## Building Toward a Smarter, More Personalized Assistant

January 27, 2025

 Meta

Follow Us

    

## Virtual reality



## Smart glasses



About us

Our community

Our actions

Support

© 2025 Meta

Community Standards

Data Policy

Terms

Cookie policy

United States

(English)